HOOVER v. McCHESNEY.

(Circuit Court, D. Kentucky. June 14, 1897.)

1. POWER OF CONGRESS—POSTAL REGULATIONS—"FRAUD ORDERS."
Act Cong. March 2, 1895, extending the powers of the postmaster general, conferred by Rev. St. § 3929, as amended by Act Sept. 19, 1890 (26 Stat. c. 908) § 2, by authorizing him, on a determination upon evidence satisfactory to him that a person or company is using the mails for the purpose of conducting a lottery or other fraudulent scheme, to order a postmaster to return all mail received at his office directed to such person or company, or his or its agents or representatives, is within the power of congress to prescribe what matter shall be excluded from the mails, so far as applied to a corporation whose business has been so determined to be in violation of the postal laws, or to its officers, such order being but a mode of excluding matter which may be presumed to be nonmailable.

2. SAME—RIGHT OF CITIZEN TO USE MAILS—DUE PROCESS OF LAW.
A citizen of the United States has a property right in the use of the mails for lawful purposes, of which he cannot be deprived without due process of law; hence congress has no power to confer authority on the head of the postal department, upon a determination on evidence satisfactory to him that a citizen is using the mails for the purpose of conducting a lottery or other fraudulent scheme, to issue an order instructing a postmaster to return or send to the dead-letter office all mail matter coming to his office directed to such person, without regard to whether such matter is or is not nonmailable.

3. CONSTITUTIONAL LAW—UNREASONABLE SEIZURES—WITHHOLDING OF MAIL.

The refusal by a postmaster to deliver mail matter addressed to a private person, who is a citizen of the United States, and the return of such mail to the senders, or to the dead-letter office, without regard to whether it is nonmailable, though done in pursuance of an executive order of the postmaster general, on a determination by him that the person to whom such mail is addressed is using the mails for unlawful purposes, is a violation of the fourth amendment to the constitution, securing the people against unreasonable seizures of their papers and effects.

4. CIRCUIT COURT—JURISDICTION TO GRANT INJUNCTION—ULTRA VIRES ACT OF EXECUTIVE OFFICER.

The circuit court has jurisdiction to grant an injunction restraining a postmaster from withholding mail matter from a citizen to whom it is directed, under an order of the postmaster general which was beyond the scope of his constitutional authority.

## On Exceptions to Answer and Motion for Temporary Injunction.

The plaintiff, in his bill, alleges: That he is a citizen of the state of Kentucky, and a business man, having extensive social, business, and general correspondence. That prior to the time indicated in the bill he enjoyed the usual and ordinary mail facilities of the citizens of the United States, not only in the conduct of his business, but also in the free enjoyment of intercourse with his family, relatives, friends, and acquaintances. That the defendant, W. M. McChesney, was duly appointed postmaster at Lexington, Ky., and qualified as such, and that as postmaster, in the exercise of his authority and the performance of his duty, and in due course of mail, received in his custody at the post office at Lexington each day for and during more than three months before the filing of the bill sealed letters, packages, and packets addressed and to be delivered to the complainant, which sealed letters, packets, and packages were mailed to him by his counsel, by his correspondents, friends, relatives, and others, and that it was the official duty of the defendant as postmaster to deliver said letters, packages, and packets so addressed to him, and received at the said post office; and that he requested of the defendant the delivery of said letters, but that in disregard of his official duty, and in violation thereof, and of the rights of the complainant, he refused to deliver said letters or packages or packets, or any of them, but arbitrarily and wrongfully, and without notice to the complainant, either before or after the seizure and detention of said letters and packages, seized and detained each and every one of said letters and packages and packets as they were received from day to day and from time to time in said office, and wholly refused to deliver said letters and packages to plaintiff, or to any one for him. That he unlawfully and wrongfully having seized and detained said letters and packages wrote or caused to be written or stamped on each and every one of said letters and packages the word "Fraudulent," and, instead of delivering the said letters and packages to him, returned part of said mail matter to the several offices from which it was forwarded, and other parts of it to the dead-letter office at Washington, D. C. That on each and every one of said letters and packages thus received at the Lexington post office the said defendant wrote or caused to be written the false, libelous, and defamatory word "Fraudulent" thereon, thereby publishing and causing to be believed by the public that this complainant was and is not a citizen of good repute, and that he was not and is not a law abiding citizen, and that all mail matter addressed to him and received at the post office at Lexington, Ky., was of an unlawful, fraudulent, and nonmailable character, and was written and addressed to him (complainant) for an unlawful and improper purpose. That by reason of the wrongful seizure and detention of said letters and packages, and the false and libelous matter so written thereon and published, the complainant has been greatly injured in his reputation and business, and has been scandalized and humiliated, and has also been, and still is, by said postmaster wholly denied and deprived of the right and privilege of using the United States mail or said post office at Lexington, Ky., for any purpose whatever during said three months last past; and that said defendant, McChesney, continues to seize and detain the mail matter of this complainant, and continues to write upon each and every package and parcel the false word "Fraudulent,"

and refuses to desist therefrom, and disposes of the said mail matter by returning it to the place from which it came, or sending it to the dead-letter office
at Washington, D. C.; and the said defendant, using and abusing his official
power and authority as postmaster at Lexington, has for the purpose and in
the manner herein set forth seized and stamped as fraudulent not only all the
personal mail matter addressed to said complainant to be delivered to him, but
also each and every letter and package and packet addressed to this complainant as an officer and employé of the firm, association, or corporation with
which he has been and is connected as an officer and employé, and the same
has been in like manner unlawfully and without due process of law seized
and detained, and by the said defendant as postmaster, and by his orders,
stamped and indorsed "Fraudulent," and has so disposed of said mail as to
prevent this complainant or the company, firm, or corporation with which he is
connected from receiving or coming in possession of the same, all of which he,
the said defendant, continues to do, and refuses to cease from so doing, against
the rights of this complainant as a citizen, and to the injury of his reputation,
business, and property, and that by reason of said unlawful and wrongful acts
of said defendant complainant is damaged in the sum of $50,000. It is also alleged as a special damage that during the time in which his mail was so withheld from him he was, in the prosecution of his business, negotiating a loan for a
client (Plummer) in the sum of $45,000 with a party in Pennsylvania, and conducting said negotiations through the United States mail, and that said negotiations when nearly completed were broken up, and the loan defeated, by the unlawful and wrongful detention and seizure of the complainant's mail matter as
herein indicated; and that by reason of said unlawful acts in thus interfering
with his mail complainant was unable to correspond with said Plummer, and
that by reason thereof complainant was damaged in the sum of $2,500. The
prayer of the bill is that the court may issue an order restraining said defendant from detaining, seizing, or tampering with the mail or mail matter of this
complainant as hereinbefore mentioned, or otherwise, except to receive and deliver said mail matter to the complainant according to his rights in the premises, and on the final hearing that the defendant may be by decree perpetually
enjoined from detaining and seizing the mail matter of this complainant, unless on complaint duly made, and by proper legal proceeding first had, and
also enjoined from detaining or interfering with the mail received at said
post office addressed to complainant, and which he is entitled to receive; and
that damages be adjudged to him. The answer admits that he is the postmaster,
and admits the allegations of the bill as to the detention and seizure of mail
matter, and the disposition made of it, and denies all damages in any sum
whatever, and sets up as justification for his acts in thus seizing, detaining, and
returning complainant's mail two orders issued by the Honorable Wm. L. Wilson, postmaster general of the United States,—one dated February 12, 1896,
as follows:

"Post-Office Department, Washington, D. C., February 12, 1896.
"Order No. 101.

"It having been made to appear to the postmaster general, upon evidence satisfactory to him, that the Southern Mutual Investment Company, Dr. A. P. Taylor, Pres., F. H. Norton, Vice Pres., T. B. Hoover, Sec., J. M. Graves, Treas.,
and Wm. J. Hoover, Gen. Mgr., at Lexington, Kentucky, are engaged in conducting a lottery or similar enterprise for the distribution of money by lot or
chance through the mails, in violation of the act of congress entitled 'An act
to amend certain sections of the Revised Statutes relating to lotteries, and for
other purposes,' approved September 19, 1890: Now, therefore, by authority
vested in him by said act, and by the act of congress entitled 'An act for the
suppression of lottery traffic through international and interstate commerce and
the postal service, subject to the jurisdiction and laws of the United States,' approved March 2, 1895, the postmaster general hereby forbids you to pay any
postal money order drawn to the order of said company or its officers, and
you are hereby directed to inform the remitter of any such postal money order
that payment thereof has been forbidden, and that the amount thereof will be
returned upon the presentation of a duplicate money order applied for and obtained under the regulations of the department. And you are hereby instructed to return all letters, whether registered or not, and other mail matter which

shall arrive at your office directed to said company or its officers to the post-masters at the offices at which they were originaly mailed, to be delivered to the senders thereof, with the word 'Fraudulent' plainly written or stamped upon the outside of such letters or matter: provided, however, that where there is nothing to indicate who are the senders of letters not registered, or other mat-ter, you are directed in that case to send such letters and matter to the dead-letter office, with the word 'Fraudulent' plainly written or stamped thereon, to be disposed of as other dead matter under the laws and regulations appli-cable thereto. Wm. L. Wilson, Postmaster General.

"To the Postmaster, Lexington, Kentucky."

—And the other, dated February 17, 1896, as follows:

"Post-Office Department, Washington, D. C., February 17, 1896.
"Order No. 106.

"It having been made to appear to the postmaster general, upon evidence sat-isfactory to him, that T. B. Hoover, at Lexington, Kentucky, is engaged in con-ducting a lottery for the distribution of money by lot or chance through the mails, in violation of the act of congress entitled 'An act to amend certain sec-tions of the Revised Statutes relating to lotteries and for other purposes,' ap-proved September 19, 1890; Now, therefore, by authority vested in him by said act, and by the act of congress entitled 'An act for the suppression of lottery traffic through international and interstate commerce and the postal service, subject to the jurisdiction and laws of the United States,' approved March 2, 1895, the postmaster general hereby forbids you to pay any postal money order drawn to the order of said party, and you are hereby directed to inform the remitter of any such postal money order that payment thereof has been forbidden, and that the amount thereof will be returned upon the presenta-tion of a duplicate money order applied for and obtained under the regulations of the department. And you are hereby instructed to return all letters, whether registered or not, and other mail matter, which shall arrive at your office di-rected to the said party to the postmasters at the offices at which they were originally mailed, to be delivered to the senders thereof, with the word 'Fraudu-lent' plainly written or stamped upon the outside of such letters or matter: provided, however, that where there is nothing to indicate who are the senders of letters not registered, or other matter, you are directed in that case to send such letters and matter to the dead-letter office, with the word 'Fraudulent' plainly written or stamped thereon, to be disposed of as other dead matter under the laws and regulations applicable thereto.

"Wm. L. Wilson, Postmaster General.
"To the Postmaster, Lexington, Kentucky."

—Which orders are alleged to have been issued by virtue of an act of congress entitled "An act to amend certain sections of the Revised Statutes relating to lotteries and for other purposes," approved September 19, 1890, and the act ap-proved March 2, 1895. The material parts of said acts are as follows:

"Sec. 2. That section thirty nine hundred and twenty nine of the Revised Statutes be and the same is hereby amended to read as follows:

" 'Sec. 3929. The postmaster general may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enter-prise, or scheme for the distribution of money, or of any real or personal prop-erty by lot, chance, or drawing of any kind, or that any person or company is conducting any other scheme or device for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, repre-sentations or promises, instruct postmasters at the post offices at which regis-tered letters arrive directed to any such person or company, or to the agent or representative of any such person or company whether such agent or repre-sentative is acting as an individual, or as a firm, bank, corporation or asso-ciation of any kind, to return all such registered letters to the postmaster at the office at which they were originally mailed, with the word "Fraudulent" plainly written or stamped upon the outside thereof; and all such letters so re-turned to such postmasters shall be by them returned to the writers thereof, under such regulations as the postmaster general may prescribe.'

"But nothing contained in this section shall be so construed as to authorize any

postmaster or other person to open any letter not addressed to himself. The public advertisement by such person or company so conducting such lottery, gift enterprise, scheme or device, that remittances for the same may be made by registered letters, to any other person, firm, bank or corporation ·or association named therein shall be held to be prima facie evidence of the existence of said agency by all the parties named therein; but the postmaster general shall not be precluded from ascertaining the existence of such agency in any other legal way satisfactory to himself.

"Sec. 3.. That section four thousand and forty one of the Revised Statutes be, and the same is hereby amended to read as follows:

" 'Sec. 4041. The postmaster general may, upon evidence satisfactory to him that any person or company is engaged in conducting any lottery, gift enterprise or scheme for the distribution of money, or of any real or personal property by lot, chance or drawing of any kind, or that any person or company is conducting any other scheme for obtaining money or property of any kind through the mails by means of false or fraudulent pretenses, representations or promises, forbid the payment by any postmaster to said person or company of any postal money orders drawn to his or its order, or in his or its favor, or to the agent of any such person or company, whether such agent is acting as an individual or as a firm, bank, corporation or association of any kind, and may provide by regulation for the return to the remitters of the sums named in such money orders.'

"But this shall not authorize any person to open àny letter not addressed to himself. The public advertisement by such person or company ·so conducting any such lottery, gift enterprise, scheme or device, that remittances for the same may be made by means of postal money orders to any other person, firm bank or corporation or association named therein, shall be held to be prima facie evidence of the existence of said agency by all the parties named therein; but the postmaster general shall not be precluded from ascertaining the existence of such agency in any other legal way."

—And the act of congress of March 2, 1895, as follows:

"Sec. 4. That the powers conferred upon the postmaster general by the statute of eighteen hundred and ninety, chapter nine hundred and eight. section two, are hereby extended and made applicable to all letters or other matter sent by mail."

This answer is excepted to by the complainants, and raises the question of whether or not the answer presents a sufficient defense to the bill of complaint, and whether or not the Honorable W. L. Wilson, postmaster general, had the constitutional right to issue the orders of February 12 and 17, 1896, and whether or not the acts of congress authorize the issuing of said orders. The complainant also moves the court for a temporary injunction restraining said defendant McChesney from withholding from him any private mail matter which comes directed to him individually, and which has no words or language or indication that they were addressed to the complainant as an officer or employé of the Southern Mutual Investment Company,.and moves the court for a temporary injunction enjoining and restraining said McChesney from withholding any of his mail.

Benj. Butterworth, J. C. Dowell, W. C. P. Breckenridge, C. B. Mathews, and J. H. Nelms, for complainant.

W. M. Smith, Dist. Atty., for defendant.

BARR, District Judge (after stating the facts as above). It will be seen from this statement of the pleadings that it is nowhere alleged that the complainant is in fact engaged in conducting a lottery scheme for the distribution of money by lot or chance, through the mails, in violation of the acts of congress, nor that any of the mail which has been seized by the defendant for the three months prior to the filing of the bill is in fact nonmailable. The defense rests entirely upon the orders issued by the postmaster general, in which it is recited that it

has been made to appear to him upon satisfactory evidence that said complainant is conducting a lottery for the distribution of money by lot or chance, through the mails, in violation of the acts of congress. The questions presented, therefore, are exceedingly important, and one of them, we think, a new one.

The colonies, prior to the old confederacy, or the adoption of the present constitution, exercised the right as a governmental one of establishing post offices and post roads. As early as 1692, in the reign of William and Mary, the colony of Virginia fixed by law the rate of postage to be charged for mail matter, a patent having been issued to Thomas Neale in that reign granting to him for a period of 120 years the right to establish and maintain a postal service in the colony of Virginia upon rates to be thereafter fixed by the colony. The act of 1692 established the postal rates, and made the postal service exclusive, except that the right to send by a friend or private person, without compensation, mail matter, was reserved. The colony also required of the patentee, Thomas Neale, that he should establish in each county one post office at least. See 3 Hen. St. at Large, p. 112. Under the old confederation, congress was invested with the sole and exclusive power of establishing and regulating post offices from one state to another throughout the United States, and exacting such postage on the papers passing through the same as might be requisite to defray the expenses of said office. When our present constitution was adopted, this power was extended, and the power of establishing post roads as well as post offices was given. In the discussion of the powers granted to the federal government this power was regarded as a very harmless one. "The power," says the Federalist, "of establishing post roads, must in every view be a harmless power, and may perhaps by judicious management become productive of great public conveniency. Nothing which tends to facilitate the intercourse between the states may be deemed unworthy of the public care." This power, however, has proven to be a most important one, and has become an indispensable part of the social and commercial life of the nation. Judge Story wrote more than 60 years ago:

"The post-office establishment has already become one of the most beneficent and useful establishments under the national government. It circulates intelligence of a commercial, political, intellectual, and private nature with incredible speed and regularity. It thus administers in a high degree to the comfort, the interests, and the necessities of persons in every rank and station of life. It brings the most distant persons and places, as it were, in contact with each other, and thus softens anxieties, increases the enjoyments, and cheers the solitude of millions of hearts. It imparts a new influence and impulse to private intercourse, and by a wider diffusion of knowledge enables political rights and duties to be performed with more uniformity and sound judgment. It is not less effective as an instrument of government in its own operations." 3 Story, Const. § 1120.

When this was written, the postal establishment of the United States was comparatively small, costing less than $2,000,000 a year, and having less than 8,000 post offices. Now it has been extended and perfected so that not only the convenience and comfort of the citizens is dependent upon it, but the business interests of thousands of citizens. This power, having been exercised by the federal govern-

ment, is exclusive of the power of the several states to establish any postal system, and has been by law made a monopoly excluding all private individuals from establishing competing or postal systems in the United States. See Rev. St. c. 9, tit. 46. As a necessary incident to this power it is now settled that congress has a right to designate what mail matter shall be carried through the mails, and how. This right of designation of necessity involves the right to exclude from the mails by declaring what postal matter is nonmailable, and the courts have sustained the exercise of what may be called the police power of excluding from the mails that which may be declared immoral or injurious to the morals of the people of the several states, and thus the power of congress to exclude from the mails all matter concerning lotteries, and all mail matter concerning fraudulent schemes, has been sustained. See Ex parte Jackson, 96 U. S. 727; In re Rapier, 143 U. S. 110, 12 Sup. Ct. 374; Horner v. U. S., 143 U. S. 571, 12 Sup. Ct. 522. In Ex parte Jackson the supreme court say:

"The power possessed by congress embraces the regulation of the entire postal system of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded. The difficulty attending the subject arises, not from a want of power in congress to prescribe regulations as to what shall constitute mail matter, but from the necessity of enforcing them consistently with the rights reserved to the people of far greater importance than the transportation of the mail. In their enforcement a distinction is to be made between different kinds of mail matter, between what is intended to be kept free from inspection, such as letters and sealed packages subject to letter postage, and what is open to inspection, such as newspapers, magazines, pamphlets, and other printed matter purposely left in condition to be examined."

While the supreme court has thus indicated the general power of congress to determine what mail matter shall be excluded, it has not as yet, we think, decided that congress has the power to delegate to an executive officer the power to determine the person or persons who shall be excluded from the right of sending and receiving mail by the postal service. If we understand the trend of the decisions, it has not yet decided that either congress or an executive officer has the right, under this power, to exclude any particular person or any class of persons, citizens of the United States, from the benefits arising from the use of the postal service of the United States. It is true, the circuit court of appeals of this circuit have affirmed the right of the postmaster general to exclude the Enterprise Savings Association and the officers of that association from the use of the money orders and registered letters under the authority of the act of 1890. The postmaster general had under said act declared that said association was engaged in conducting a lottery or a similar enterprise for the distribution of money or personal property by lot or chance through the mails in violation of the provisions of section 3894, Rev. St., as amended; but, as this was a corporation presumably organized and conducted for the purpose of carrying on a business which was declared to be nonmailable, it may be fairly said that this was a mere mode of excluding postal matter from the mail which was nonmailable. The order of the postmaster general, however, under the then law, only applied to money orders and the registered mail. Judge Lurton, in delivering

the opinion of the court (Association v. Zunstein, 15 C. C. A. 153, 67 Fed. 1000), indicated that there may be a difference between the ordinary mail and the postal service by money orders and registered mail, saying:

"Neither of these departments of the postal service are essential to the ordinary use of the mail, and congress has reposed in the postmaster general an unlimited discretion as to when and where he would afford the facilities of this department. We see no reason why congress may not confer upon him authority to prevent the use of these facilities by any person engaged in using them for the propagation of any business deemed by it vicious, and not entitled to the use of such special facilities in the extension and conduct of such schemes."

This decision would seem to decide that the order of the 12th of February, 1896, was valid, and authorized the defendant to retain mail matter coming to the Southern Mutual Investment Company and its officers.

In the order of the 17th of February, 1896, of the postmaster general, he has excluded the complainant, a citizen of the United States, from the use of the mails in receiving any mail matter of any kind or description, and this exclusion is intended to deprive, and does in fact deprive, him of any benefit of the postal service of the United States, so far as receiving mail is concerned. The order does not confine this exclusion to matter which is declared nonmailable under the act of congress, or that which the defendant may believe from inspection to be nonmailable under the law, but excludes him from receiving mail of any kind or description. If the complainant has a right to receive mail which is mailable, and that right is in the nature of a property right, then certainly he has not in this case been deprived of such right by due process of law. If, however, the use of the postal service of the United States by a citizen thereof is a mere privilege or gratuity which can be given or refused by those in charge of the postal service, then he has no right to invoke the protection of the fifth amendment of the constitution. As we understand, this right of seizure and detention of the mail of the complainant under the order of an executive officer is justified upon the theory that all of this correspondence through the mails concerns matter for the use of which the mail has been prohibited. It will be observed that this order deprives all correspondents with the complainant of their right to the use of the mails of the United States for correspondence with him, so that the order assumes not only that he is engaged in conducting a lottery enterprise, but that all persons who correspond with him are thus engaged, and to that extent deprives other persons who are presumably innocent from the use of the mail. It may, in this connection, be admitted that the government of the United States has heretofore exercised the power, and has the constitutional right, by its executive officers or agents, to seize a thing which is being used in violation of law. In such cases the thing seized is treated as guilty. Thus, in the revenue law, illicit distilleries are seized, if found in operation, and destroyed if under $500 in value, with a provision that, if shown not to be guilty, the owners thereof may have compensation therefor; if over $500 in value, proceedings are taken in the courts against the thing seized, and, if found guilty, forfeited by the owner and condemned.

But it would be quite a different exercise of power if congress should authorize the secretary of the treasury or the commissioner of internal revenue, after being satisfied by evidence that a particular citizen was guilty of carrying on the business of illicit distilling, that thereafter the several collectors should be directed that that particular citizen should not be allowed to have the preliminary surveys or to execute the bond which would be necessary for him to lawfully carry on the business of a distiller. So in the postal service, the authority of congress to have seized nonmailable matter that may come into the mails, whether that matter be so because of its physical condition or moral character, may be conceded; but we submit that it is the exercise, not of an executive power, but of a judicial one, for an executive officer to exclude a citizen from the use of the mail because he, in the opinion of the executive officer, at some time previously or then had been or was violating the law by using the mail in an improper manner by sending nonmailable matter, unless this right to use the mail be a mere privilege or gratuity, which may be given or refused at the will of those who control the postal service.

It is not to be overlooked that the establishment of the postal service and its operation is the exercise of a governmental function; that the money which pays for this perfect postal system is raised by the postage charged, and all deficits paid out of the common treasury of the United States; that it is a monopoly which excludes not only the states, but all individuals, and that it has become a part of the business operations of the citizens of the United States, and an indispensable part in some kinds of business; and that this right to the use of the mails by sending and receiving mail is a most valuable one to the citizens, and one the depriving of which would destroy the business and the living of very many of the citizens of the United States. This postal monopoly, if granted and exercised by a citizen or a corporation, would, from the fact of its being a monopoly, make it imperative that all persons who paid the postal rates and conformed to the reasonable regulations of the postal service should have a common right to the use of the mails, and that because of the fact of the monopoly thus granted. This right would be protected in the courts if the citizen or the corporation controlling the postal service should attempt to deprive him of it. If the United States government should hereafter become the owner of all the transportation lines in the United States, and thus the common carrier of the nation, and by law exclude all others from becoming common carriers, it would seem to follow inevitably that the citizens of the United States would have a common right to travel and ship freight over the lines thus owned and operated by the United States, and that all of its citizens, subject to such general laws and regulations as to rates and the operation of the lines as might be enacted and established, would have this common right, and that such a right would be readily recognized as a property right in the citizen, and one of which a particular citizen could not be deprived except by due process of law. We think the right to the use of the mails, though in degree much less valuable than the use of the transportation lines, would be equally a property right, and one which could not be taken away except by due process of law. Mr. Webster,

in the Dartmouth College Case, 4 Wheat. 518, defined "the law of the land," which is but another expression for "due process of law," thus:

"By the law of the land is most clearly intended the general law,—a law which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen should hold his life, liberty, and property and immunities under the protection of the general rules which govern society. Everything which may pass under the form of enactment is not, therefore, to be considered the law of the land. If this were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees, and forfeitures in all possible forms would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void. It would tend directly to establish the union of all powers in the legislature."

Mr. Cooley thinks that this definition of Mr. Webster is quite accurate as applied to the judicial department of the government, but probably is not broad enough as applied to all the departments, and expresses the opinion that the definition of Judge Johnson in the case of Bank of Columbia v. Okely, 4 Wheat. 235, as more comprehensive and more accurate. Justice Johnson says:

"As to the words from Magna Charta incorporated into the constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government unrestrained by the established principles of private right and distributive justice."

If we are correct in concluding that the use of the postal service of the United States by a citizen thereof is a right in the nature of a property right, then it must follow that the order of the 17th of February, 1896, of the postmaster general, which finds complainant guilty of a violation of the postal laws, and prohibits to him the use of the postal service of the United States as far as the receiving of mail is concerned, during his pleasure, is not due process of law within the constitutional meaning. In this connection we think the fourth amendment to the constitution is also applicable, which provides that "the right of the people to be secured in their persons, houses, papers, and effects against unreasonable search and seizures shall not be violated, and no warrant shall issue but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." The supreme court, by Justice Field, in the case of Ex parte Jackson, says:

"A distinction is to be made between different kinds of mail matter, between what is intended to be kept free from inspection, such as letters and sealed packages subject to letter postage, and what is open to inspection, such as newspapers, magazines, pamphlets, and other printed matter purposely left in a condition to be examined. Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secured in their papers against unreasonable search and seizure extends to their papers thus closed against inspection wherever they may be; whilst in the mail they can only be opened and examined under like warrant, issued under similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household. No law of congress can place in the hands of the officials of the postal

service any authority to invade the secrecy of letters and such sealed packages in the mail, and all regulations adopted as to mail matter of this kind must be in subordination to the great principle embodied in the fourth amendment of the constitution."

Whether we regard these letters, which were sent through the mail properly addressed, and in the hands of the defendant, as belonging to the sender or to the complainant, to whom they were sent, they should be and are constitutionally equally exempt from seizure, except under this provision of the constitution. When, therefore, sealed letters and packages were seized by the defendant under the order of February 17, 1896, without warrant, and marked "Fraudulent," and returned to the dead-letter office, to be there disposed of as other dead matter under the laws and regulations, we submit that this provision of the constitution has been violated. In the case of Boyd v. U. S., 116 U. S. 616, 6 Sup. Ct. 524, the supreme court decided that the fifth section of the act of June 22, 1874, entitled "An act to amend the custom revenue laws," etc., which section authorized a court of the United States, in revenue cases, on motion of the government's attorney, to require the defendant or claimant to produce in court his private books, invoices, and papers, or else the allegations of the complainant be taken as confessed, to be unconstitutional, because within this provision of the constitution. The opinion of the court, delivered by Justice Bradley, goes elaborately into a discussion of this subject, and holds that, although this act did not authorize the actual seizure of the private books, invoices, and papers of the defendant, yet it required him to produce in court these papers under a penalty of a confession of the allegations of the information, which was within the spirit of the constitutional inhibition, and was, in the constitutional sense, a search and seizure of the papers without warrant. It is true that Justice Miller and Chief Justice Waite dissented from this construction of this constitutional provision, and held that in fact there was no search and no seizure authorized by the law. They concur in the conclusion of the court because of the fifth amendment to the constitution, which declares that no one shall be compelled in a criminal case to be a witness against himself. Still we think the case is in point here, whichever view is the correct one, as there clearly is in fact a detention and seizure of the mail, and, instead of delivering it to the complainant, it is returned to the sender in one case and in the other to the dead-letter office, there to be opened and destroyed or otherwise disposed of as might be ordered. If the detention and seizure was lawful, there is nothing to prevent these letters and sealed packages from being used as evidence either against the complainant or his correspondents.

The remaining question is whether or not the complainant's bill for an injunction will lie. It is the settled doctrine that the courts cannot control or interfere with the judgment or discretion of an executive officer, except where the duties to be performed are purely ministerial. See Marbury v. Madison, 1 Cranch, 137; McIntire v. Wood, 7 Cranch, 504; Kendall v. U. S., 12 Pet. 524; Decatur v. Paulding, 14 Pet. 497; Commissioner of Patents v. Whiteley, 4 Wall. 522; Gaines v. Thompson, 7 Wall. 347; U. S. v. Black, 128 U. S. 40, 9 Sup. Ct. 12;

U. S. v. Windom, 137 U. S. 636, 11 Sup. Ct. 197. Or, as we think, where the statute under which he acts is unconstitutional. In this case no objection has been made, either by motion, plea, or answer, to the jurisdiction of the court. The judiciary act, conferring jurisdiction on the circuit court, gives that court jurisdiction of all cases arising under the laws and constitution of the United States which exceed in value $2,000. It must be conceded, notwithstanding there has been no objection to the jurisdiction of the court, that the court cannot grant relief under the motion for temporary injunction if it is without jurisdiction. An action at law would be ineffectual, and could not be sustained in this case by the complainant for the recovery of this mail, because no description could be given of the mail thus seized and detained, and because of the multiplicity of suits that would necessarily follow, and the utter inadequacy of a common-law remedy. It is conceded to the broadest extent that, if the postmaster general had the constitutional right to not only declare that the complainant was engaged in conducting a lottery for the distribution of money or other personal property by lot or chance through the mails, but thereupon to prohibit him from the use of the mails absolutely, then this court cannot revise the postmaster general's discretion and judgment under said statute; but we submit that, if he had no constitutional right to exercise the judgment and discretion which he has exercised in thus condemning the plaintiff to a forfeiture of the use of the postal service of the United States, this court can, by proper proceeding, so declare. We fully recognize that the court, in taking jurisdiction, is not asked either to compel by mandatory injunction or by restraining order the performance of a ministerial duty. We fully recognize the settled doctrine as announced in the case of Gaines v. Thompson, 7 Wall. 347, and the various other cases therein reviewed and those since that time, as well as the authority of the case of Association v. Zumstein, 15 C. C. A. 153, 67 Fed. 1000, but we, however, submit that, if correct in our view, congress had no constitutional right to give to the postmaster general the authority thus to prohibit to a citizen of the United States, without notice and without trial, the use of the postal service of the United States, at his pleasure, because he became satisfied that that citizen had been or was engaged in conducting a lottery or similar enterprise. Chief Justice Marshall, in the case of Marbury v. Madison, 1 Cranch, 137, we think indicated clearly in his opinion that if the authority under which the executive department or an officer thereof was acting was unconstitutional, the judiciary could so declare in a proper case brought before it, which affected the private rights of a citizen. In the case of Commerford v. Thompson, reported in 1 Fed. 417, and in Bank v. Merchant, reported in 18 Fed. 841, both Justice Brown and Judge Pardee sustained a bill to enjoin a postal officer of the United States. In the first case, Justice Brown (then District Judge Brown), though sustaining the jurisdiction, refused the injunction, because the answer, the allegations of which were admitted, alleged that the mail which had been detained and seized was concerning lotteries; and in the case of Bank v. Merchant, Judge Pardee granted the injunction. In the case of Noble v. Railroad Co., 147 U. S. 165, 13 Sup. Ct. 271, a bill for an in-

junction against the secretary was recognized as the proper remedy. The lower court decreed an injunction, which was affirmed by the supreme court. There the secretary of the interior, under an act of congress which gave him the right to designate a railroad, and grant to that railroad a right of way over the public lands, had exercised the right, but it was admitted in the pleadings that the railroad was not engaged in the business of a common carrier of passengers and freight, but simply in the transportation of logs for the private use and benefit of the persons composing the logging company, and carrying on a private business. Subsequently the successor of the then secretary of the interior, Mr. Vilas, being satisfied that the right of way should not have been given to this private railway, revoked the order of his predecessor. The logging company filed a bill in equity to enjoin the secretary of the interior and the commissioner of the general land office from executing the order revoking the approval of the complainant's maps and right of way over the public lands, and also from molesting it in the enjoyment of such right as was secured by said previous order under the act of congress. The supreme court, by Justice Brown, in reviewing and setting out the doctrine and the distinction between the power of courts to require of an executive officer the execution of a merely ministerial duty and those duties in which he was given an executive discretion, say:

"We have no doubt the principle of these decisions applies to a case wherein it is contended that the act of a head of a department, under any view that can be taken of the facts that were laid before him, were ultra vires, and beyond the scope of his authority. If he has no power at all to do the act complained of, he is as much subject to an injunction as he would be to a mandamus if he refused to do an act which the law plainly required him to do. As observed by Justice Bradley in Board of Liquidation v. McComb, 92 U. S. 531: 'But it has been well settled when a plain official duty requiring no exercise of discretion is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have mandamus to compel its performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it. In such cases the writs of mandamus and injunction are somewhat correlative to each other.' "

And the lower court's decree was affirmed upon the distinct idea that the subsequent secretary of the interior had no power over the matter, after a careful consideration and discussion of the finality of the act of the previous secretary. And in the case of New Orleans v. Paine, 147 U. S. 264, 13 Sup. Ct. 305, the court, by Justice Brown, say:

"In Noble v. Railroad Co. (decided at the present term) 147 U. S. 165, 13 Sup. Ct. 271, we had occasion to examine the question as to when a court was authorized to interfere by injunction with the action of a head of a department, and came to the conclusion it was only where, in any view of the facts that could be taken, such action was beyond the scope of his authority. If he were engaged in the performance of a duty which involved the exercise of discretion or judgment, he was entitled to protection from any interference by the judicial power. In that case it appeared that the only remedy of the plaintiff was to enjoin the secretary of the interior from revoking his approval of a certain map, which operated as a grant of land. His contemplated action amounted in fact to the cancellation of a land patent."

These cases, we think, are a distinct ruling that a bill of injunction is the proper remedy, if in law the authority exercised by the postmaster general is beyond his constitutional authority. Any other view than herein expressed would leave a citizen without remedy, and this perfect and magnificent postal system of the United States subject as to its use to the arbitrary will of the postmaster general. If he can decide finally, without court or jury or other legal trial, whether a business which is being carried on is within the statutory prohibition, and also that a certain citizen or citizens are engaged in that business, and, having thus decided, can prohibit absolutely by general order the use of the mails and postal service of the United States, not only in that business, but by such citizen or citizens, then, indeed, as to this use, are the citizens of the United States outside of the guaranties of the constitution.

As already indicated, the principles announced by the circuit court of appeals in the case of Association v. Zumstein, and which are binding upon this court, prevent the granting of motion No. 1 for temporary injunction against the defendant, McChesney, restraining him from withholding any mail matter which comes to him as postmaster under the order of February 12, 1896, addressed to complainant as secretary of the Southern Mutual Investment Company; but motion No. 2, for a temporary injunction to restrain the defendant, McChesney, as postmaster, from withholding and refusing to deliver to complainant letters directed to him upon which there are no words, language, or indications that they are addressed to said Hoover as an officer of or connected with the Southern Mutual Investment Co., should be sustained, upon the execution of a proper bond in the penalty of $———. The said opinion of the circuit court of appeals is decisive, we think, against the exceptions to the answer which are based upon the contention that the order of the postmaster general of the 12th of February, 1896, is invalid, and beyond his constitutional authority; but exceptions Nos. 4 and 8, which relate to the order of the 17th of February, 1896, should be sustained, and so much of the other exceptions as relate to said order of February 17, 1896, and said motions and exceptions, will be sustained, and overruled as herein indicated.