UNITED STATES of America, Plaintiff,

v.

**Robert Eugene BLACK and Alternate Systems, Inc., Defendants.**

No. 76–48–CR2.

United States District Court,
D. Kansas.

June 28, 1976.

---

E. Edward Johnson, U. S. Atty., Monti L. Belot, Asst. U. S. Atty., Topeka, Kan., for plaintiff.

Robert L. Lundblad, Kansas City, Kan., for defendants.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

This is a criminal action wherein the defendants ROBERT EUGENE BLACK, individually and in his official capacity as President of Alternate Systems, Inc., and ALTERNATE SYSTEMS, INC., are charged by information with the establishment of a private express for the conveyance of letters in violation of 18 U.S.C. § 1696.

Defendants filed a motion to dismiss the information. At the hearing on said motion, all parties and counsel agreed to submit the case to the court for trial and disposition on a written stipulation of facts. At the same time the court would consider and rule on the defendants' motion to dismiss.

The written stipulation has now been filed and the facts therein contained shall constitute the court's findings of fact as to both defendants. [See Rule 23(c), Federal Rules of Criminal Procedure]. The defendants' motion to dismiss is deemed more properly a motion for judgment of acquittal at the conclusion of all the evidence. [Rule 29(a), *supra*].

Highly summarized, the stipulation discloses that Alternate Systems, Inc. was incorporated under the laws of Kansas on February 12, 1976, and has been engaged in business in Pittsburg and Frontenac, Crawford County, Kansas, since March 9, 1976. From on or about March 1, 1976, Robert Eugene Black, on behalf of Alternate Systems, Inc., actively solicited business establishments in the City of Pittsburg, seeking delivery of items over post routes in the cities of Pittsburg and Frontenac. These two cities have established post routes between and over which mail is regularly carried. These routes have been in existence and have been utilized by the United States Postal Service during all times pertinent to this action. From on and after March 9, 1976, the defendants established delivery routes in the cities of Pittsburg and Frontenac, which routes coincided with the above post routes.

The stipulation further establishes that in response to a business solicitation from the defendant Black, a doctor in Pittsburg utilized the services of Alternate Systems, Inc. in sending statements for medical services to his patients. One of the statements was in a letter addressed to the patient in Pittsburg, and the letter was delivered by defendants to the named addressee. It is stipulated the defendants delivered the let-

ter knowingly and wilfully, but they did so in the good faith belief that the criminal statute 18 U.S.C. § 1696, under which defendants are charged, is unconstitutional.

In support of their attack on the constitutionality of the statute, defendants first claim the creation of a postal monopoly exceeds the power granted to Congress by the Constitution and restricts certain rights therein reserved to the people, namely, the right of free enterprise. Defense counsel concedes there is considerable case law which may and is frequently cited for the proposition that the postal monopoly created by Congress is constitutional. Nevertheless, the argument is advanced that the courts have never squarely faced a monopoly challenge.

Article One, Section Eight of the Constitution of the United States vests power in Congress to establish post offices and post roads. The United States Supreme Court has recognized this power as embracing the regulation of the entire postal system of the country. In *Ex Parte Jackson,* 96 U.S. 727, 24 L.Ed. 877 (1877) the court said:

"The power vested in Congress 'to establish post-offices and post-roads' has been practically construed, since the foundation of the government, to authorize not merely the designation of the routes over which the mail shall be carried, and the offices where letters and other documents shall be received to be distributed or forwarded, but the carriage of the mail, and all measures necessary to secure its safe and speedy transit, and the prompt delivery of its contents. The validity of legislation prescribing what should be carried, and its weight and form, and the charges to which it should be subjected, has never been questioned. . . . The power possessed by Congress embraces the regulation of the entire postal system of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded." (at 732).

". . . To give efficiency to its [Congress'] regulations and prevent rival postal systems, it may perhaps prohibit the carriage by others for hire, over postal routes, of articles which legitimately constitute mail matter, in the sense in which those terms were used when the Constitution was adopted, consisting of letters, and of newspapers and pamphlets, when not sent as merchandise; but further than this its power of prohibition cannot extend." (at 735).

The exclusive power of Congress to regulate the postal system has deep historical roots. In 1656 the Post Office Department of England was first established, and to some degree ever since has monopolized the business of carrying the mail of its citizens. Even prior to the old Confederacy, the American colonies exercised as a governmental right, the establishment of post offices and post roads. Under the old Articles of Confederation, the Continental Congress was invested with the sole and exclusive power of establishing and regulating post offices throughout the United States. When our present Constitution was adopted this power was extended, and the power to establish post roads, as well as post offices, was given.

After carefully reviewing the history and development of the postal system, the court in *Hoover v. M'Chesney,* 81 F. 472 (C.C.D. Ky.1897), described the monopolistic character of the system in the following language:

"It is not to be overlooked that the establishment of the postal service and its operation is the exercise of a governmental function; that the money which pays for this perfect postal system is raised by the postage charged, and all deficits paid out of the common treasury of the United States; that it is a monopoly which excludes not only the states, but all individuals, . . ." (at 480).

The right of Congress to protect its monopoly with respect to the conveyance of "letters or packets" is well grounded in judicial precedent. Predecessor statutes of what is now 18 U.S.C. § 1696 were considered in the frequently cited cases of *Blackham v. Gresham,* 16 F. 609 (C.C.S.D.N.Y.1883), and *Williams v. Wells Fargo & Co. Express,* 177 F. 352 (8th Cir. 1910). Each of

these cases involved a factual situation similar to that found in the instant case. These decisions leave no doubt that a true governmental monopoly was intended by Congress as to the carriage and delivery of "letters or packets," and the statutes involved effectively prohibited private persons from engaging in such activity. In *Wells Fargo,* the court said:

> "While at one time questioned, there remains no doubt but that, under the constitutional authority granted, Congress may, as it has done, reserve to the postal department of the government a monopoly of the business of receiving, transmitting, and delivering the mails of the country, and in the exercise of such right of monopoly Congress may enact such rules, regulations, and laws as will effectively preserve such right of monopoly intact, and as will deter all others, including private right of monopoly intact, and as will deter all others, including private individuals and express companies, from engaging therein, and to this end Congress may prescribe such fines, penalties, forfeitures, and punishments as it may deem proper to preserve this right of monopoly retained by the government. For this purpose section 3982 above quoted was enacted." (at 356).

> ". . . Such laws enacted for the purpose of preserving the right of monopoly in the Post Office Department of the government, and preventing private express and other companies and individuals from engaging therein, have many times received the consideration of the courts of this country, as will be seen from a reading of a few of the many cases. (citing cases)." (at 357).

> "While from the foregoing cases it will be seen many questions arose touching the right of the government to be protected in its monopoly in the business of receiving, transporting, and delivering the mail matter of the country, consisting of letters or packets of letters, and touching the construction of penal laws designed to prohibit all others than the Post Office Department of the government from engaging in the business of carrying letters or packets for hire over post roads, yet in none has it been decided or even contended the word 'packet' employed in the statute was designed or intended by Congress to be construed as granting the Post Office Department a monopoly of the right to receive, transport, and deliver parcels or packages of merchandise. On the contrary, the entire history of the legislation on this subject from the beginning and the many adjudicated cases as well, show the legislative intent to have been to maintain for the government a monopoly only of the carriage of its mails, consisting of letters and packets of letters, and the like mailable matter." (at 358).

Of more recent vintage, we find a case arising in our own circuit, *National Ass'n of Letter Car. v. Independent Postal Sys.,* 470 F.2d 265 (10th Cir. 1972), affirming 336 F.Supp. 804 (W.D.Okl.1971). This was an injunction action directed against the defendants who proposed to sell their own postage stamps, and themselves deliver individually addressed Christmas cards in envelopes bearing those stamps. In upholding the granting of injunctive relief by the lower court, the circuit court specifically recognized that the private express statutes (39 U.S.C. § 601, and its criminal counterpart 18 U.S.C. § 1696) are designed to give effect to the constitutional mandate that Congress establish "Post Offices and post roads" and the plain intent of the statutes is that the United States shall have a monopoly in the delivery of letters. The court further observed that the defendants, by their proposed operations, would break this monopoly and siphon off what was described as the "cream" of the postal operation; that is, the delivery of certain letters in various metropolitan areas without payment of United States postage.

The concern of the courts for the maintenance of the governmental monopoly, in order to safeguard the financial integrity of the system, was also expressed in *Blackham v. Gresham, supra,* where a "free enterprise" argument similar to that urged here was rejected:

". . . If private agencies can be established, the income of the government may be so reduced that economy might demand a discontinuance of the system; and thus the business which it is the right and duty of the government to conduct for the interest of all, and on such terms that all may avail themselves of it with advantage, may be handed over to individuals or corporations who will conduct it with the sole view of making money, and who may find it for their profit to exclude localities or classes from the benefit of the service." (at 612).

The defendants in the instant case have cited no authority in support of their monopoly challenge. Instead, they only seek to distinguish the cases herein discussed, and beg the question by asserting the courts have "consistently acquiesced in the constitutionality of the postal monopoly," rather than come to grips with the issue. We do not believe the historical circumstances attending the framing and adoption of the Constitution can be so lightly ignored.

History convinces us that the framers of our Constitution were concerned that Congress be given broad powers to develop a postal system that would meet the needs of all the people in the entire country. The specific grant of power also carried with it the power to enact all laws which may be necessary and proper to carry into effect the power expressly granted. (Article 1, § 8). The establishment of post offices and post roads was a matter of great national interest and importance. The experience of England and that of our forefathers, down through the time of the Revolution, should have left little or no doubt that the business of carrying mail could best be accomplished by placing sole and exclusive power in Congress. Contrary to defendants' arguments, the constitutional grant of power carried with it no express or implied limitation. In the exercise of its legislative wisdom, Congress saw fit to create a postal monopoly with respect to certain types of mail—specifically, letters, such as are involved here. In fact, the Second Congress, in 1792, enacted the first postal statute prohibiting private persons from carrying letters for hire. This action was entirely consistent with the experience of early day governments in England and America. In each and every case reaching the courts since that time, the right of Congress to create and maintain a postal monopoly has met with judicial approbation.

■■■ Faced with such precedent, both legislative and judicial, we can only conclude that defendants have failed to sustain the heavy burden of establishing the unconstitutionality of 18 U.S.C. § 1696 which, as a penal statute, carries with it presumptive validity.

Defendants make an additional argument to the effect that if Congress can prohibit transportation of a letter by any means other than the postal service, then "it is highly conceivable" that the price of postage can be increased to the point that "many poor people" and "small businesses that depend on the mails" will be severely restricted in their ability to communicate by letter. Obviously, defendants seek to mount a First Amendment challenge premised on the guarantee that Congress shall make no law abridging the freedom of speech.

■■■ This argument is so speculative and filled with conjecture as to deserve little or no comment. Defendants make no claim the private express statutes as now administered violate their own First Amendment rights. The most they can say is that the statutes *might* affect, in the *future,* First Amendment rights of *other* persons or groups of persons. There has been no showing that application of 18 U.S.C. § 1696 has resulted in an abridgment of defendants' freedom of speech. The court is of the opinion that defendants simply are in no position to have their First Amendment challenge considered. One may not be heard to challenge the constitutionality of a statute on the ground that it may conceivably be applied to other individuals, in other situations not before the court. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973);

*United States v. Maestas,* 523 F.2d 316 (10th Cir. 1975). Also see *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

The court holds that 18 U.S.C. § 1696 is not unconstitutional for any of the reasons asserted by defendants. Accordingly, their motion for judgment of acquittal is denied.

The court further holds that the conduct of defendants as disclosed in the stipulation of facts falls squarely within the proscriptions of 18 U.S.C. § 1696. The defendants are found and adjudged guilty of the offense charged in the information.

A presentence investigation is ordered to be made. Sentencing is set for July 19, 1976, at 1:30 P.M. Defendants and counsel are directed to be present.

IT IS SO ORDERED.