# LOPEZ *v.* UNITED STATES.

No. 236. Argued January 14, 1963.—
Decided May 27, 1963.

*Edward J. Davis* argued the cause for petitioner. With him on the brief was *Gerald F. Muldoon.*

*Louis F. Claiborne* argued the cause for the United States. With him on the brief were *Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg* and *Jerome M. Feit.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

The petitioner, German S. Lopez, was tried in a federal court on a four-count indictment charging him with attempted bribery of an Internal Revenue Agent, Roger S. Davis, in violation of 18 U. S. C. § 201.[1] The questions

---

[1] 18 U. S. C. § 201 provides:

"Whoever promises, offers, or gives any money or thing of value . . . to any officer or employee or person acting for or on behalf of the United States, or any department or agency thereof, in any official function . . . with intent to influence his decision or action on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity, or in his place of trust or profit, or with intent to influence him to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States, or to induce him to do or omit to do any act in violation of his lawful duty, shall be fined not more than three times the amount of such money or value of such thing or imprisoned not more than three years, or both.".

before us for review are: (1) whether the trial court's treatment of "entrapment" constituted reversible error; and (2) whether Davis' testimony relating to a conversation with petitioner on October 24, 1961, which formed the basis of the three counts of the indictment on which petitioner was convicted, and a wire recording of that conversation, were properly admitted into evidence.

The evidence at the trial related to three meetings between Lopez and Davis that took place at Clauson's Inn, situated at North Falmouth, Massachusetts, and operated by Lopez under a lease. Davis, who was investigating possible evasion of excise taxes in the area, first visited the Inn on the afternoon of August 31, 1961, when he asked Lopez whether there was any dancing, singing, or other entertainment in the evenings and showed him an advertisement for the Inn which stated that there was. Lopez said there was no entertainment and denied responsibility for the advertisement. Davis returned again that evening and saw dancing in the bar and lounge. He described the Inn in a report to his superior the next day as a "potential delinquent" and said that he would "follow up."

Davis next returned to the Inn on October 21, when he again saw dancing in the bar and lounge, and spoke with Lopez. Davis' testimony about this meeting may be summarized as follows: Early in the discussion, Davis told Lopez that he thought the establishment would be liable for a cabaret tax and asked to see the books, but Lopez resisted and suggested that they continue the conversation in his office. Once there, Lopez suggested that he would like to avoid all "aggravation" and to reach an "agreement." After Davis said he could not drop the matter and would return the following week, Lopez said he didn't wish to "insult" Davis and that he didn't know

whether to take him into his "confidence." Receiving no reply, Lopez put some money on the desk saying:

"You can drop this case. Here's $200. Buy your wife a present. And I'll have more money for you at Christmas time. This is all I have now."

Davis balked, and Lopez urged him to take the money and to bring his wife and family for a weekend "as my guest." Following some questioning as to the extent of Lopez' business, during the course of which Davis estimated a year's tax as running to $3,000, Lopez added another $220 to the money on the desk, stating that he did not want to be bothered with returns for past years but would file a return for the current quarter. More importunities on Lopez' part followed and Davis finally took the money. Before Davis left, Lopez again said he would file a return for the current quarter and asked Davis to come back on October 24.

Lopez, in his version of the events of October 21, admitted giving the $420 to Davis but said the money was given in an effort to have Davis prepare his returns and get his books in proper order. According to Lopez' testimony, he told Davis that he would file returns from October 17 on, since on that date the Inn had changed its policy to one of entertainment.

After leaving the Inn, Davis reported the meeting to a fellow agent and to his superior and turned over the $420 to a Regional Inspector. On the morning of October 24, he met with four Internal Revenue Inspectors, who instructed him to keep his appointment with Lopez, to "pretend to play along with the scheme," and to draw the conversation back to the meeting of October 21. Davis was then equipped with two electronic devices, a pocket battery-operated transmitter (which subsequently failed to work) and a pocket wire recorder, which recorded the conversation between Lopez and Davis at their meeting later in the day.

According to the recording of that conversation, Davis suggested they talk in Lopez' office and, once inside the office, Davis started to explain the excise tax form and to discuss the return. Before any computations were made, Lopez said he had never thought he needed to file a cabaret tax return, and the conversation then continued:

"Lopez: . . . Whatever we decide to do from here on I'd like you to be on my side and visit with me. Deduct anything you think you should and I'll be happy to . . . because you may prevent something coming up in the office. If you think I should be advised about it let me know. Pick up the phone. I can meet you in town or anywhere you want. For your information the other night I have to . . .

"Davis: Well, you know I've got a job to do.

"Lopez: Yes, and Uncle Sam' is bigger than you and I are and we pay a lot of taxes, and if we can benefit something by it individually, let's keep it that way and believe me anything that transpires between you and I, not even my wife or my accountant or anybody is aware of it. So I want you to feel that way about it." [2]

The two then discussed receipts and the potential tax liability for 1959–1961, and Lopez protested that Davis' estimates were very high, although he did not deny the fact of liability. After Davis said, "I don't want to get greedy or anything," Lopez gave him $200 and later in the conversation told Davis he could bring his family down for a free weekend and should "[c]ome in every so often and I'll give you a couple of hundred dollars every time you come in." At one point, Lopez said "Now if you should suggest that I should file returns from this point on, I'll do it. If you suggest that I can get by

---

[2] There have been no omissions from this passage. The indicated elisions appear in the original record.

without doing it, then just drop in every so often and I'll . . ." Lopez also confirmed that he had given Davis $420 on October 21.

Lopez, in his testimony, did not question the accuracy of the recording and in fact said little more about the meeting of October 24 than that Davis had gone into a lot of figures and that he (Lopez) had become emotionally upset because he felt that Davis "was not there for the purpose that he came in there for on October 21st." He did not suggest that Davis had induced him to offer any bribes.

The first of the four counts in the ensuing indictment charged that at the meeting of October 21, Lopez gave Davis the $420 with intent to induce Davis, among other things, "to refrain from making an examination of the books and records relating to sales and receipts" at the Inn from 1959–1961.[3] The remaining three counts related to the meeting of October 24, and charged three separate acts of attempted bribery, each for the purpose of influencing Davis to aid in concealing sales, receipts, and any cabaret tax due for the years 1959–1961. The acts were the giving of $200 to Davis (Count 2), the promise of an additional $200 the following month (Count 3), and the promise of a free weekend for Davis and his family (Count 4).

Prior to trial, petitioner filed a motion to suppress as evidence the wire recording of the October 24 conversation between Lopez and Davis. After hearing, this motion was denied. At trial, the motion was renewed and again denied, and the recording was received in evidence. Petitioner did not object to the testimony of Agent Davis relating to the October 24 conversation.

---

[3] Count 1 also charged that the money was given to induce Davis "to refrain . . . from computing a cabaret tax on . . . [the business of the Inn], and from reporting same to the Internal Revenue Service."

In his charge to the jury, the trial judge emphasized the presumption of innocence and the burden on the Government to establish "every essential element" of the crime beyond a reasonable doubt. He then detailed what these essential elements were and called particular attention to the contrast between the specific intent charged in Count 1—to prevent an examination of books and records—and the more general-intent charged in the other three counts—to conceal liability for the tax in question. He strongly suggested that the specific intent alleged in Count 1 had not been established beyond a reasonable doubt.

Although defense counsel had briefly adverted to the possibility of "entrapment" in his summation to the jury, he did not request judgment of acquittal on that ground. Nor did he request any instruction on the point or offer at the trial any evidence particularly aimed at such a defense. Nevertheless, the trial judge did charge on entrapment.[4] Petitioner made no objection to this instruction, or to any other aspect of the charge.

---

[4] "Now the law with respect to entrapment is this: if a government agent by improper means or over-bearing persuasion or wrongful conduct induces a person of ordinary firmness to commit a crime which he would not otherwise commit, then under those circumstances the defendant is to be acquitted, not because he did not do something wrongful but because he was induced to do a wrongful act which he would not otherwise have done.

"Now needless to say in all types of law enforcement, particularly with respect to matters involving certain types of regulatory statutes, it is often difficult for the government to get evidence, and government agents may properly, and without violating the law, or their duty, take such steps as make it possible to procure evidence even though such steps involve their own participation, provided that their participation is not a deliberate temptation to men of ordinary firmness, provided that they do not cause a crime to be committed by someone who does not have a criminal disposition to commit that crime.

"The burden of proof with respect to entrapment is on the defendant. And you are to ask yourself whether in fact on the evidence

The jury acquitted on Count 1 and found petitioner guilty on Counts 2, 3 and 4. A motion for judgment notwithstanding the verdict "as a matter of law on the evidence" was denied, and petitioner was sentenced to a term of imprisonment for one year.

Following *per curiam* affirmance of the conviction by the Court of Appeals for the First Circuit, 305 F. 2d 825, we granted certiorari, 371 U. S. 859, to consider the two questions stated at the outset of this opinion. *Supra,* pp. 428–429.

I.

The defense of entrapment, its meaning, purpose, and application, are problems that have sharply divided this Court on past occasions. See *Sorrells* v. *United States,* 287 U. S. 435; *Sherman* v. *United States,* 356 U. S. 369; *Masciale* v. *United States,* 356 U. S. 386. Whether in the absence of a conclusive showing the defense is for the court or the jury, and whether the controlling standard looks only to the conduct of the Government, or also takes into account the predisposition of the defendant, are among the issues that have been mooted. We need not, however, concern ourselves with any of these questions here, for under any approach, petitioner's belated claim of entrapment is insubstantial, and the record fails to show any prejudice that would warrant reversal on this score.

The conduct with which the defense of entrapment is concerned is the *manufacturing* of crime by law enforcement officials and their agents. Such conduct, of course, is far different from the permissible stratagems involved in the detection and prevention of crime. Thus before

---

you heard you are persuaded by the preponderance of that evidence that Agent Davis, as it were, created the crime and the temptation, and he, Agent Davis, was the instigator and author of a crime that would never under any circumstances have taken place, had he not used unfair means."

the issue of entrapment can fairly be said to have been presented in a criminal prosecution there must have been at least some showing of the kind of conduct by government agents which may well have induced the accused to commit the crime charged.

In the case before us, we think that such a showing has not been made. It is undisputed that at the meeting of October 21, petitioner made an unsolicited offer of $420 to Agent Davis. The references to the October 21 offer in the recorded conversation scarcely leave room for doubt that this offer was made for the same general purpose as the bribes offered at the October 24 meeting: to obtain Davis' assistance in concealing any cabaret tax liability for past and present periods.[5] As to the meeting of October 24, the recording shows that petitioner's improper overtures began almost at the outset of the discussion, when he stated: "Deduct anything you think you should and I'll be happy to . . . because you may prevent something coming up in the office." This and similar statements preceded Davis' computations,[6] and his comment, "I don't want to get greedy,"

---

[5] That this was the purpose of the October 21 offer is in no way inconsistent with the verdict of acquittal on Count 1. Count 1, as noted above, charged, among other things, a specific intent to induce the agent not to examine books and records, and the court in its charge attached great emphasis to the language of this count. Thus it may well have been that the acquittal on Count 1 was based solely on the jury's conclusion that the Government had not proved the existence of the specific intent beyond a reasonable doubt.

[6] Petitioner claims that Davis' assertions of the existence of cabaret tax liability, and of the extent of that liability, were so recklessly false as to suggest or require a finding of entrapment. But as noted, petitioner's overtures preceded these assertions, and in any event, Davis had ample basis for believing that taxes were due, and petitioner never undertook to deny his liability during the conversation on October 24. Although Davis conceded that he may have made some errors in computation because of "nervousness," petitioner in his testimony made no claim that these computations led to the bribe offers.

on which petitioner so heavily relies. Moreover, we find nothing in the recording as a whole, or in petitioner's own testimony, to suggest that his conduct on October 24 was instigated by Davis. Upon any reasonable assessment of the record, it seems manifest that all that Davis was doing was to afford an opportunity for the continuation of a course of criminal conduct, upon which the petitioner had earlier voluntarily embarked, under circumstances susceptible of proof.

It is therefore evident that, under any theory, entrapment has not been shown as a matter of law. Indeed, the paucity of the showing might well have justified a refusal to instruct the jury at all on entrapment.[7] But in any event no request for such an instruction was made, and there was no objection to the instruction given. Under these circumstances, petitioner may not now challenge the form of that instruction. See Fed. Rules Crim. Proc., 30;[8] *Moore* v. *United States,* 262 F. 2d 216; *Martinez* v. *United States,* 300 F. 2d 9. Nor was there on this score any such plain error in the charge, affecting substantial rights, as would warrant reversal despite the failure to object. See Fed. Rules Crim. Proc., 52 (b). Since the record does not disclose a sufficient showing that petitioner was induced to offer a bribe, we cannot conclude that he was prejudiced by the charge on burden of proof, even assuming that the burden called for

---

[7] Petitioner does not claim that the issue of entrapment should always be decided by the court and never submitted to the jury, and we are not now presented with that question. See *Sherman* v. *United States,* 356 U. S. 369; *Masciale* v. *United States,* 356 U. S. 386.

[8] Rule 30 provides in pertinent part:
"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

was too great. By the same token, we are not persuaded that in this case it is significant to determine whether entrapment should turn on the effect of the Government's conduct on "men of ordinary firmness," as the court charged, or on the effect on the particular defendant. Accordingly, we do not reach the question whether the charge was in every respect a correct statement of the law. It is enough to say that in the circumstances of this case, there was in any event no reversible error.

## II.

Petitioner's remaining contentions concern the admissibility of the evidence relating to his conversation with Davis on October 24. His argument is primarily addressed to the recording of the conversation, which he claims was obtained in violation of his rights under the Fourth Amendment.[9] Recognizing the weakness of this position if Davis was properly permitted to testify about the same conversation, petitioner now challenges that testimony as well, although he failed to do so at the trial. His theory is that, in view of Davis' alleged falsification of his mission, he gained access to petitioner's office by misrepresentation and all evidence obtained in the office, i. e., his conversation with petitioner, was illegally "seized." In support of this theory, he relies on *Gouled* v. *United States*, 255 U. S. 298, and *Silverman* v. *United States*, 365 U. S. 505. But under the circumstances of the present case, neither of these decisions lends any comfort to petitioner, and indeed their rationale buttresses

---

[9] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

the conclusion that the evidence was properly admitted. See On Lee v. United States, 343 U. S. 747.[10]

We need not be long detained by the belated claim that Davis should not have been permitted to testify about the conversation of October 24. Davis was not guilty of an unlawful invasion of petitioner's office simply because his apparent willingness to accept a bribe was not real. Compare Wong Sun v. United States, 371 U. S. 471. He was in the office with petitioner's consent, and while there he did not violate the privacy of the office by seizing something surreptitiously without petitioner's knowledge. Compare Gouled v. United States, supra. The only evidence obtained consisted of statements made by Lopez to Davis, statements which Lopez knew full well could be used against him by Davis if he wished. We decline to hold that whenever an offer of a bribe is made in private, and the offeree does not intend to accept, that offer is a constitutionally protected communication.

Once it is plain that Davis could properly testify about his conversation with Lopez, the constitutional claim relating to the recording of that conversation emerges in proper perspective. The Court has in the past sustained instances of "electronic eavesdropping" against constitutional challenge, when devices have been used to enable government agents to overhear conversations which would have been beyond the reach of the human ear. See, e. g., Olmstead v. United States, 277 U. S. 438; Goldman v. United States, 316 U. S. 129. It has been insisted only that the electronic device not be planted by an unlawful physical invasion of a constitu-

[10] In On Lee, the defendant had been induced to make certain statements by an old acquaintance who, without the defendant's knowledge, had turned government informer and was carrying a small concealed microphone which transmitted the conversation to a narcotics agent some distance away. Thus any differences between On Lee and this case cut against the petitioner.

tionally protected area. *Silverman* v. *United States, supra.* The validity of these decisions is not in question. here. Indeed this case involves no "eavesdropping" whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. And the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment. It was carried in and out by an agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself.

The case is thus quite similar to *Rathbun* v. *United States,* 355 U. S. 107, in which we sustained against statutory attack the admission in evidence of the testimony of a policeman as to a conversation he overheard on an extension telephone with the consent of a party to the conversation. The present case, if anything, is even clearer, since in *Rathbun* it was conceded by all concerned "that either party may *record* the conversation and publish it." 355 U. S., at 110. (Emphasis added.)

Stripped to its essentials, petitioner's argument amounts to saying that he has a constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment. For no other argument can justify excluding an accurate version of a conversation that the agent could testify to from memory.[11] We think the risk that petitioner took in offering a bribe to Davis fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording.

---

[11] The trustworthiness of the recording is not challenged.

It is urged that whether or not the recording violated petitioner's constitutional rights, we should prevent its introduction in evidence in this federal trial in the exercise of our supervisory powers. But the court's inherent power to refuse to receive material evidence is a power that must be sparingly exercised. Its application in the present case, where there has been no manifestly improper conduct by federal officials, would be wholly unwarranted.[12]

The function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against the defendant. Proper fulfillment of this function requires that, constitutional limitations aside, all relevant, competent evidence be admissible, unless the manner in which it has been obtained—for example, by violating some statute or rule of procedure—compels the formulation of a rule excluding its introduction in a federal court. See, *e. g., McNabb* v. *United States,* 318 U. S. 332; *Mallory* v. *United States,* 354 U. S. 449.

When we look for the overriding considerations that might require the exclusion of the highly useful evidence involved here, we find nothing. There has been no invasion of constitutionally protected rights, and no violation of federal law or rules of procedure. Indeed, there has not even been any electronic eavesdropping on a private conversation which government agents could not otherwise have overheard. There has, in short, been no act of any kind which could justify the creation of an exclusionary rule. We therefore conclude that the judgment of the Court of Appeals must be

*Affirmed.*

---

[12] Since Agent Davis himself testified to the conversation with petitioner which was the subject matter of the recording, the question whether there may be circumstances in which the use of such recordings in evidence should be limited to purposes of "corroboration" is not presented by this case.

Mr. Chief Justice Warren, concurring in the result.

I concur in the result achieved by the Court but feel compelled to state my views separately. As pointed out in the dissenting opinion of Mr. Justice Brennan, the majority opinion may be interpreted as reaffirming *sub silentio* the result in *On Lee* v. *United States,* 343 U. S. 747. Since I agree with Mr. Justice Brennan that *On Lee* was wrongly decided and should not be revitalized, but base my views on grounds different from those stated in the dissent, I have chosen to concur specially. Although the dissent assumes that this case and *On Lee* are in all respects the same, to me they are quite dissimilar constitutionally and from the viewpoint of what this Court should permit under its supervisory powers over the administration of criminal justice in the federal courts.

I also share the opinion of Mr. Justice Brennan that the fantastic advances in the field of electronic communication constitute a great danger to the privacy of the individual; that indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments; and that these considerations impose a heavier responsibility on this Court in its supervision of the fairness of procedures in the federal court system. However, I do not believe that, as a result, all uses of such devices should be proscribed either as unconstitutional or as unfair law enforcement methods. One of the lines I would draw would be between this case and *On Lee.*

As Mr. Justice Harlan sets out in greater detail, Agent Davis, upon entering the premises of the petitioner, gave full notice of both his authority and purpose—to investigate possible evasion or delinquency in the payment of federal taxes. In the course of this investigation, the petitioner offered Davis a bribe and promised more in the future if Davis would conceal the facts of the petitioner's tax evasion. Davis accepted the money and

promptly reported it to his superiors. On a return visit to the petitioner's place of business to complete the investigation, Davis was outfitted with a concealed recorder to tape his conversation with the petitioner. At trial, Davis testified to both of his conversations with the petitioner, and the tape recording was introduced to corroborate this testimony. The petitioner did not claim he was entrapped into the bribery or that the purpose of the investigation from the start was to induce the bribe. On the contrary, he admitted giving the money to Davis but claimed that it was for the purpose of having the latter prepare his tax return. The only purpose the recording served was to protect the credibility of Davis against that of a man who wished to corrupt a public servant in the performance of his public trust. I find nothing unfair in this procedure. Tax agents like Agent Davis are required to examine the tax returns of suspected tax evaders as a necessary part of our national taxation system. Many of these taxpayers interviewed are integral parts of the underworld. In the performance of their duty, agents are thus often faced with situations where proof of an attempted bribe will be a matter of their word against that of the tax evader and perhaps some of his associates. They should not be defenseless against outright denials or claims of entrapment, claims which, if not open to conclusive refutation, will undermine the reputation of the individual agent for honesty and the public's confidence in his work. Where confronted with such a situation, it is only fair that an agent be permitted to support his credibility with a recording as Agent Davis did in this case.

*On Lee,* however, is a completely different story. When On Lee was arrested, the only direct evidence that he was engaged in the distribution of opium was the unreliable testimony of an alleged accomplice who handled

the contacts with purchasers and had made the mistake of selling to an undercover narcotics agent. To strengthen its case against On Lee, the Government sent a "special employee," one Chin Poy, into On Lee's laundry armed with a concealed transmitter, On Lee being out on bail pending indictment at the time. Chin Poy had known On Lee for 16 years and had formerly been his employee. His criminal character is exposed by the familiarity with which he and On Lee discussed the narcotics traffic and the agreement of the latter to supply him with narcotics at his request in the future. Thus, Chin Poy, armed with the transmitter, engaged On Lee in conversation for the purpose of eliciting admissions that On Lee was part of an opium syndicate and to encourage him to commit another crime. At trial, instead of calling Chin Poy to testify, the Government put on the narcotics agent who had been at the receiving end of the radio contact with Chin Poy to testify to the admissions made by On Lee, testimony that led directly to conviction.

The use and purpose of the transmitter in *On Lee* was substantially different from the use of the recorder here. Its advantage was not to corroborate the testimony of Chin Poy, but rather, to obviate the need to put him on the stand. The Court in *On Lee* itself stated:

> "We can only speculate on the reasons why Chin Poy was not called. It seems a not unlikely assumption that the very defects of character and blemishes of record which made On Lee trust him with confidences would make a jury distrust his testimony. Chin Poy was close enough to the underworld to serve as bait, near enough the criminal design so that petitioner would embrace him as a confidante, but too close to it for the Government to vouch for him as a witness. Instead, the Government called agent Lee."

However, there were further advantages in not using Chin Poy. Had Chin Poy been available for cross-examination, counsel for On Lee could have explored the nature of Chin Poy's friendship with On Lee, the possibility of other unmonitored conversations and appeals to friendship, the possibility of entrapments, police pressure brought to bear to persuade Chin Poy to turn informer, and Chin Poy's own recollection of the contents of the conversation. His testimony might not only have seriously discredited the prosecution, but might also have raised questions of constitutional proportions. This Court has not yet established the limits within which the police may use an informer to appeal to friendship and camaraderie-in-crime to induce admissions from a suspect, but suffice it to say here, the issue is substantial. We have already struck down the use of psychological pressures and appeals to friendship to induce admissions or confessions under not totally dissimilar circumstances. *Leyra* v. *Denno,* 347 U. S. 556; *Spano* v. *New York,* 360 U. S. 315.[1] Yet the fact remains that without the testimony of Chin Poy, counsel for On Lee could not develop a record sufficient to raise and present the issue for decision, and the courts could not evaluate the full impact of such

---

[1] The facts in *On Lee* may also have involved a right to counsel issue. The New York Court of Appeals has recently ruled that after a person has been arraigned, any statement obtained outside the presence of his counsel and without advice as to his rights is inadmissible at trial since the petitioner is entitled to the presence of counsel at every stage in the proceedings after arraignment. *People* v. *Meyer,* 11 N. Y. 2d 162, 182 N. E. 2d 103; cf. *Gideon* v. *Wainwright,* 372 U. S. 335; *Spano* v. *New York, supra,* p. 324 (DOUGLAS, J., concurring). The statement in *Meyer* was made to a police officer voluntarily and without solicitation while Meyer was on bail awaiting submission of his case to the grand jury. Presumably, any agent of the prosecutor would be circumscribed by this rule whether he be a "special employee" like Chin Poy or a patrolman on the beat.

practices upon the rights of an accused or upon the administration of criminal justice.[2]

It is no answer to say that the defense can call an informer such as Chin Poy as a hostile witness. The prosecution may have an interest in concealing his identity or whereabouts. *Roviaro* v. *United States,* 353 U. S. 53. He may be so undependable and disreputable that no defense counsel would risk putting him on the stand. Moreover, as a defense witness, he would be open to impeachment by the Government, his late employer. The tactical possibilities of this situation would be apparent to a prosecutor bent on obtaining conviction. Through use of a recorder or transmitter, he may place in the case-in-chief evidence of statements supporting conviction which is not open to impeachment. And if not required to call the informer, he may place on the defense the onus of finding and calling a disreputable witness who, if called, may be impeached on all collateral issues favoring the defense. The effect on law enforcement practices need hardly be stated: the more disreputable the informer employed by the Government, the less likely the accused will be able to establish any questionable law enforcement methods used to convict him.

Thus while I join the Court in permitting the use of electronic devices to corroborate an agent under the particular facts of this case, I cannot sanction by implication the use of these same devices to radically shift the

---

[2] Where the similar defense of entrapment has been involved, cross-examination of the government informer has invariably been critical to the defense. See *Sherman* v. *United States,* 356 U. S. 369, 371–375. Had the Government been able to limit its case in *Sherman* to recordings of the final meetings between the informer and the petitioner wherein the illegal sales were consummated, the record would never have revealed the long series of meetings inducing the petitioner to make these sales. The officers in charge were apparently unaware they had ever taken place. 356 U. S., at 374–375.

pattern of presentation of evidence in the criminal trial, a shift that may be used to conceal substantial factual and legal issues concerning the rights of the accused and the administration of criminal justice.[3]   Cf. *On Lee* v. *United States,* 343 U. S. 747, 758 (BLACK, J., dissenting).

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE GOLDBERG join, dissenting.

In *On Lee* v. *United States,* 343 U. S. 747, the Court sustained the admission in evidence of the testimony of a federal agent as to incriminating statements made by the accused, a laundryman, on trial for narcotics offenses. The statements were made by the accused while at large on bail pending trial in a conversation in his shop with an acquaintance and former employee, who, unknown to the accused, was a government informer and carried a radio transmitter concealed on his person.   The federal agent,

---

[3] If a party were to show that the interests of justice in a particular case so require, the Court should consider limiting the use of evidence obtained by means of a recorder or transmitter to corroboration of a witness who was a party to the conversation in question. To so condition the use of evidence in the federal courts is clearly within the power of this Court.   As the Court stated in *McNabb* v. *United States,* 318 U. S. 332, 341:

"In the exercise of its supervisory authority over the administration of criminal justice in the federal courts, see *Nardone* v. *United States,* 308 U. S. 338, 341–42, this Court has, from the very beginning of its history, formulated rules of evidence to be applied in federal criminal prosecutions.  . . . [Collecting authority.]   And in formulating such rules of evidence for federal criminal trials the Court has been guided by considerations of justice not limited to the strict canons of evidentiary relevance."

See *Upshaw* v. *United States,* 335 U. S. 410, 414–416 (dissenting opinion); Rule 26, Federal Rules of Criminal Procedure.   In *McNabb* itself, the purpose of the exclusionary rule adopted was to eliminate all incentive to engage in law enforcement practices universally condemned—use of the "third degree" to obtain confessions immediately after arrest.

equipped with a radio receiver tuned to the transmitter, heard the transmitted conversation while standing on the sidewalk outside the laundry. The Court rejected arguments invoking the Fourth Amendment and our supervisory power against the admissibility of the agent's testimony. I believe that that decision was error, in reason and authority, at the time it was decided; that subsequent decisions and subsequent experience have sapped whatever vitality it may once have had; that it should now be regarded as overruled; that the instant case is rationally indistinguishable; and that, therefore, we should reverse the judgment below.

## I.

The United States in its brief and oral argument before this Court in the instant case made little effort to justify the result in *On Lee,* doubtless because it realizes that that decision has lost virtually all its force as authority. Instead, the Government seeks to distinguish the instant case. This strategy has succeeded, it appears, with a majority of my Brethren. The Court's refusal to accord more than passing mention in its opinion to the only decision of this Court—*On Lee*—factually analogous to the case at bar suggests very strongly that some of my colleagues who have joined the Court's opinion today agree with us that *On Lee* should be considered a dead letter. For the Court, rather than follow *On Lee,* has adopted the substance of the Government's attempted distinction between *On Lee* and the instant case.

The Government argues as follows: "Petitioner can hardly complain that his secret thoughts were unfairly extracted from him, for they were, from the beginning, intended to be put into words, and to be communicated to the very auditor who heard them." This argument has two prongs and I take the second first. To be sure, there were two auditors in *On Lee*—the informer

and the federal agent outside. But equally are there two auditors here—the federal agent and the Minifon. In *On Lee,* the informer was the vehicle whereby the accused's statements were transmitted to a third party, whose subsequent testimony was evidence of the statements. So here, the intended auditor, Agent Davis, was the vehicle enabling the Minifon to record petitioner's statements in a form that could be, and was, offered as evidence thereof.

The Government would have it that the "human witness [Davis] actually testifies and the machine merely repeats and corroborates his narrative." But it can make no difference that Davis did, and the informer in *On Lee* did not, himself testify; for the challenged evidence, the Minifon recording, is *independent* evidence of the statements to which Davis also testified. A mechanical recording is not evidence that is merely repetitive or corroborative of human testimony. To be sure, it must be authenticated before it can be introduced. But once it is authenticated, its credibility does not depend upon the credibility of the human witness. Therein does a mechanical recording of a conversation differ fundamentally from, for example, notes that one of the parties to the conversation may have taken. A trier of fact credits the notes only insofar as he credits the notetaker. But he credits the Minifon recording not because he believes Davis accurately testified as to Lopez' statements but because he believes the Minifon accurately transcribed those statements. This distinction is well settled in the law of evidence, and it has been held that Minifon recordings are independent third-party evidence. *Monroe* v. *United States,* 98 U. S. App. D. C. 228, 233–234, 234 F. 2d 49, 54–55.[1]

---

[1] See *Burgman* v. *United States,* 88 U. S. App. D. C. 184, 188 F. 2d 637; *Belfield* v. *Coop,* 8 Ill. 2d 293, 134 N. E. 2d 249 (1956); *Boyne City, G. & A. R. Co.* v. *Anderson,* 146 Mich. 328, 109 N. W.

The other half of the Government's argument is that Lopez surrendered his right of privacy when he communicated his "secret thoughts" to Agent Davis. The assumption, manifestly untenable, is that the Fourth Amendment is only designed to protect secrecy. If a person commits his secret thoughts to paper, that is no license for the police to seize the paper; if a person communicates his secret thoughts verbally to another, that is no license for the police to record the words. *Silverman* v. *United States,* 365 U. S. 505. *On Lee* certainly rested on no such theory of waiver. The right of privacy would mean little if it were limited to a person's solitary thoughts, and so fostered secretiveness. It must embrace a concept of the liberty of one's communications, and historically it has. "The common law secures to each individual the right of determining, ordinarily, to what extent his thoughts,

---

429 (1906); *State* v. *Reyes,* 209 Ore. 595, 636, 308 P. 2d 182, 196 (1957); *Paulson* v. *Scott,* 260 Wis. 141, 50 N. W. 2d 376 (1951). "The ground for receiving the testimony of the phonograph would seem to be stronger [than in the case of the telephone], since in its case there is not only proof by the human witness of the making of the sounds to be reproduced, but a reproduction by the mechanical witness of the sounds themselves." *Boyne City, G. & A. R. Co.* v. *Anderson, supra.* See generally Annotation, Admissibility of Sound Recordings in Evidence, 58 A. L. R. 2d 1024 (1958). This is to be contrasted with documents offered as evidence of past recollection recorded or present recollection revived, which have no status unless verified by a witness from his personal knowledge. "The witness must be able *now* to assert that the record accurately represented his knowledge and recollection at the time. The usual phrase requires the witness to affirm that he 'knew it to be true at the time.'" 3 Wigmore, Evidence (3d ed. 1940), § 747. "It follows from the nature of the purpose [present recollection revived] for which the paper is used . . . that it is in no strict sense *testimony.* In this respect it differs from a record of past recollection, which is adopted by the witness as the embodiment of his testimony and, as thus adopted, becomes his present evidence . . . ." 3 *id.,* § 763. It is to be noted that in both cases the documents come in only on the strength of the witness' testimony.

sentiments, and emotions shall be communicated to others . . . and even if he has chosen to give them expression, he generally retains the power *to fix the limits of the publicity which shall be given them.*" Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 198 (1890). (Emphasis supplied.)

That is not to say that all communications are privileged. On Lee assumed the risk that his acquaintance would divulge their conversation; Lopez assumed the same risk *vis-à-vis* Davis. The risk inheres in all communications which are not in the sight of the law privileged. It is not an undue risk to ask persons to assume, for it does no more than compel them to use discretion in choosing their auditors, to make damaging disclosures only to persons whose character and motives may be trusted. But the risk which both *On Lee* and today's decision impose is of a different order. It is the risk that third parties, whether mechanical auditors like the Minifon or human transcribers of mechanical transmissions as in *On Lee*—third parties who cannot be shut out of a conversation as conventional eavesdroppers can be, merely by a lowering of voices, or withdrawing to a private place— may give independent evidence of any conversation. There is only one way to guard against such a risk, and that is to keep one's mouth shut on all occasions.

It is no answer to say that there is no social interest in encouraging Lopez to offer bribes to federal agents. Neither is there a social interest in allowing a murderer to conceal the murder weapon in his home. But there is a right of liberty of communications as of possessions, and the right can only be secure if its limitations are defined within a framework of principle. The Fourth Amendment does not forbid all searches, but it defines the limits and conditions of permissible searches; the compelled disclosure of private communications by electronic means ought equally to be subject to legal regulation.

And if this principle is granted, I see no reasoned basis for reaching different results depending upon whether the conversation is with a private person, with a federal undercover agent (*On Lee*), or with an avowed federal agent, as here.

THE CHIEF JUSTICE, concurring in the Court's result, suggests two further distinctions between *On Lee* and the instant case: first, that Agent Davis, in carrying a concealed recording device, was legitimately seeking to protect his reputation as an honest public servant; and second, that in the instant case, unlike *On Lee*, electronically obtained evidence was not used so as to circumvent the production of the key government witness. I admit these are differences, but I do not see how they bear upon the problem of the case before us, which is the admissibility in a federal criminal trial of the fruits of surreptitious electronic surveillance. Whether a federal tax agent, in order to convince his superiors that he was indeed offered the bribe and did not solicit it, ought to be permitted to carry a Minifon on his person is a separate question from whether the recording made by the Minifon is constitutionally permissible evidence in a federal criminal trial; I take it Lopez would have no standing to challenge the use of such recordings save in a prosecution or other proceeding against him. And whether it is unfair for the Government to introduce electronic evidence without putting the human agent of transmission on the stand seems to me to implicate considerations which have nothing to do with the principle of individual freedom enshrined in the Fourth Amendment. On Lee's trial may well have been less fair than Lopez' because of the withholding of the government informer as a witness. But the invasion of freedom was in both cases the same: the secret electronic transmission or recording of private communications, Lopez' to Davis and On Lee's to the undercover agent.

## II.

If *On Lee* and the instant case are in principle indistinguishable, the question of the continued validity of the Court's position in *On Lee* is inescapably before us. But we cannot approach the question properly without first clearing away another bit of underbrush: the suggestion that the right of privacy is lost not by the speaker's giving verbal form to his secret thoughts, but by the auditor's consenting to an electronic transcription of the speaker's words. The suggestion is an open invitation to law enforcement officers to use cat's-paws and decoys in conjunction with electronic equipment, as in *On Lee*. More important, it invokes a fictive sense of waiver wholly incompatible with any meaningful concept of liberty of communication. If a person must always be on his guard against his auditor's having authorized a secret recording of their conversation, he will be no less reluctant to speak freely than if his risk is that a third party is doing the recording. Surely high government officials are not the only persons who find it essential to be able to say things "off the record." I believe that there is a grave danger of chilling all private, free, and unconstrained communication if secret recordings, turned over to law enforcement officers by one party to a conversation, are competent evidence of any self-incriminating statements the speaker may have made. In a free society, people ought not to have to watch their every word so carefully.

Nothing in *Rathbun* v. *United States*, 355 U. S. 107, is to the contrary. We held in that case that evidence obtained by police officers' listening in to a telephone conversation on an existing extension with the consent of one of the parties, who was also the subscriber to the extension, did not violate the federal wiretapping Act, 47 U. S. C. § 605. The decision was a narrow one. The grant of certiorari was limited to the question of statutory

construction, and neither the majority nor dissenting opinion discusses any other possible basis for excluding the evidence. Furthermore, as the Court was careful to emphasize, extension phones are in common use, so common that it is a normal risk of telephoning that more than one person may be listening in at the receiver's end. The extension telephone by means of which Rathbun's statements were heard had not been specially installed for law enforcement purposes, and no attempt was made to transcribe the phone conversation electronically. Thus in the Court's view wiretapping in the conventional sense was not involved and § 605 had no application. It should also be pointed out that while it is a very serious inconvenience to be inhibited from speaking freely over the telephone, it perhaps is a far graver danger to a free society if a person is inhibited from speaking out in his home or office.[2]

### III.

The question before us comes down to whether there is a legal basis, either in the Fourth Amendment or in the supervisory power,[3] for excluding from federal criminal

---

[2] If anything, *Rathbun* supports the position that the right of privacy is not forfeited merely because the auditor authorizes electronic eavesdropping. The Court might have grounded its decision in the fact that the receiver had consented to the police officers' listening in; since § 605 proscribes only unauthorized interceptions of telephonic communications, the Court could have held that the listening in was authorized, but it did not, turning the case entirely on the absence of interception within the meaning of the statute, and carefully differentiating between use of an existing extension phone and other modes of listening in. Thus the concession in *Rathbun* which the Court today quotes was pure dictum.

[3] The failure of Lopez or his counsel to raise or argue the supervisory-power point does not bar us from considering it. For the interest secured by the exercise of the power is that of the federal courts themselves, not of the parties. "[T]he objection that the plaintiff comes with unclean hands will be taken by the court itself. It will be taken despite the wish to the contrary of all the parties to the

trials the fruits of surreptitious electronic surveillance by federal agents.

History and the text of the Constitution point the true path to the answer. In the celebrated case of *Entick* v. *Carrington*, 19 Howell's State Trials 1029 (C. P. 1765), Lord Camden laid down two distinct principles: that general search warrants are unlawful because of their uncertainty; and that searches for evidence are unlawful because they infringe the privilege against self-incrimination.[4] Lord Camden's double focus was carried over into the structure of the Fourth Amendment. See Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937), 103; Fraenkel, Concerning Searches and Seizures, 34 Harv. L. Rev. 361, 366 (1921).[5] The two clauses of the Amendment are in the conjunctive, and plainly have distinct functions. The Warrant Clause was aimed specifically at the evil of the general warrant, often regarded as the single immediate cause of the American Revolution.[6] But the first clause

---

litigation. The court protects itself." *Olmstead* v. *United States*, 277 U. S. 438, 485 (Brandeis, J., dissenting). (Footnote omitted.)

[4] "It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle." 19 Howell's State Trials, at 1073.

[5] The text of the Fourth Amendment is as follows: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[6] "Historically we are dealing with a provision of the Constitution which sought to guard against an abuse that more than any one single factor gave rise to American independence. John Adams surely is a competent witness on the causes of the American Revolution. And he it was who said of Otis' argument against search by the police . . . , 'American independence was then and there born.' 10

embodies a more encompassing principle. It is, in light of the *Entick* decision, that government ought not to have the untrammeled right to extract evidence from people. Thus viewed, the Fourth Amendment is complementary to the Fifth. *Feldman* v. *United States,* 322 U. S. 487, 489–490. The informing principle of both Amendments is nothing less than a comprehensive right of personal liberty in the face of governmental intrusion.

And so this Court held in *Boyd* v. *United States,* 116 U. S. 616, "a case that will be remembered as long as civil liberty lives in the United States" (Brandeis, J., dissenting in *Olmstead* v. *United States,* 277 U. S. 438, 474):

> "The principles laid down in this opinion [*Entick* v. *Carrington*] affect the very essence of constitutional liberty and security. They reach farther than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offence,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used

_____

Adams, *Works* 247." *Harris* v. *United States,* 331 U. S. 145, 159 (dissenting opinion).

Of course, the Warrant Clause not only outlaws general warrants, but also establishes the root principle of judicial superintendence of searches and seizures. See p. 464, *infra.*

as evidence to convict him of crime or to forfeit his goods, is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other." 116 U. S., at 630.

The Court in *Boyd* set its face against a narrowly literal conception of "search and seizure," instead reading the Fourth and Fifth Amendments together as creating a broad right to inviolate personality. *Boyd* itself was not a search and seizure case in the conventional sense, but involved an order to compel production of documents in the nature of a subpoena *duces tecum*. And *Boyd* had been preceded by *Ex parte Jackson,* 96 U. S. 727, 735, in which the Court had clearly intimated that a statute permitting government officials to open letters in the mail would violate the Fourth Amendment. See also *Hoover* v. *McChesney,* 81 F. 472 (Cir. Ct. D. Ky. 1897).

The authority of the *Boyd* decision has never been impeached. Its basic principle, that the Fourth and Fifth Amendments interact to create a comprehensive right of privacy, of individual freedom, has been repeatedly approved in the decisions of this Court.[7] Thus we have held that the gist of the Fourth Amendment is "[t]he security of one's privacy against arbitrary intrusion by the police." *Wolf* v. *Colorado,* 338 U. S. 25, 27; *Stefanelli* v. *Minard,* 342 U. S. 117, 119; *Frank* v. *Maryland,* 359 U. S.

---

[7] *E. g., Bram* v. *United States,* 168 U. S. 532, 543–544; *Hale* v. *Henkel,* 201 U. S. 43, 71; *Weeks* v. *United States,* 232 U. S. 383; *Gouled* v. *United States,* 255 U. S. 298, 306; *Amos* v. *United States,* 255 U. S. 313; *Agnello* v. *United States,* 269 U. S. 20, 33–34; *McGuire* v. *United States,* 273 U. S. 95, 99; *United States* v. *Lefkowitz,* 285 U. S. 452, 467; *Feldman* v. *United States, supra,* at 489–490; *Davis* v. *United States,* 328 U. S. 582, 587; *Zap* v. *United States,* 328 U. S. 624, 628.

The Court's liberal construction of the Fourth is paralleled by its similarly liberal construction of the Fifth. See, *e. g., Counselman* v. *Hitchcock,* 142 U. S. 547, 562.

360, 362. Only two Terms ago, in reaffirming that the Fourth Amendment's "right to privacy" is a "basic constitutional right," *Mapp* v. *Ohio,* 367 U. S. 643, 656, we remarked the " 'intimate relation' " between the Fourth and Fifth Amendments. *Id.,* at 657. So also, the Court's insistence that the Fourth Amendment is to be liberally construed, *e. g., Byars* v. *United States,* 273 U. S. 28, 32; *United States* v. *Lefkowitz,* 285 U. S. 452, 464; *Grau* v. *United States,* 287 U. S. 124, that searches for and seizures of mere evidence as opposed to the fruits or instrumentalities of crime are impermissible under any circumstances, *e. g., United States* v. *Lefkowitz, supra,* at 464–466; *Harris* v. *United States,* 331 U. S. 145, 154; *Abel* v. *United States,* 362 U. S. 217, 237–238, and that the Fourth Amendment is violated whether the search or seizure is accomplished by force, by subterfuge, *Gouled* v. *United States,* 255 U. S. 298, 306; see, *e. g., Gatewood* v. *United States,* 209 F. 2d 789; *Fraternal Order of Eagles* v. *United States,* 57 F. 2d 93; *United States* v. *General Pharmacal Co.,* 205 F. Supp. 692; *United States* v. *Bush,* 172 F. Supp. 818; *United States* v. *Reckis,* 119 F. Supp. 687; *United States* v. *Mitchneck,* 2 F. Supp. 225; but see *United States* v. *Bush,* 283 F. 2d 51, reversing 172 F. Supp. 818, by an invalid subpoena, see, *e. g. Hale* v. *Henkel,* 201 U. S. 43, 76; *Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U. S. 298; *Brown* v. *United States,* 276 U. S. 134, or otherwise, see *e. g., Wakkuri* v. *United States,* 67 F. 2d 844, is confirmation that the purpose of the Amendment is to protect individual liberty in the broadest sense from governmental intrusion. And see *Poe* v. *Ullman,* 367 U. S. 497, 549–552 (dissenting opinion).

It is against this background that we must appraise *Olmstead* v. *United States, supra,* where the Court, over the dissents of Justices Holmes, Brandeis, Stone, and Butler, held that the fruits of wiretapping by federal officers were admissible as evidence in federal criminal trials. The

Court's holding, which is fully pertinent here,[8] rested on the propositions that there had been no search because no trespass had been committed against the petitioners and no seizure because no physical evidence had been obtained, thus making the Fourth Amendment inapplicable; and that evidence was not inadmissible in federal criminal trials merely because obtained by federal officers by methods violative of state law or otherwise unethical.

When the Court first confronted the problem of electronic surveillance apart from wiretapping, *Olmstead* was deemed to control, five members of the Court declining to reexamine the soundness of that decision. *Goldman v. United States,* 316 U. S. 129. In turn, *Olmstead* and *Goldman* were deemed to compel the result in *On Lee.* But cf. note 10, *infra.* The instant case, too, hinges on the soundness and continued authority of the *Olmstead* decision. I think it is demonstrable that *Olmstead* was erroneously decided, that its authority has been steadily

---

[8] In part, the Court rested its decision on considerations thought peculiar to wiretapping, *i. e.,* the interception of telephonic communications. "The language of the Amendment can not be extended and expanded to include telephone wires reaching to the whole world from the defendant's house or office. The intervening wires are not part of his house or office any more than are the highways along which they are stretched." 277 U. S., at 465. "The reasonable view is that one who installs in his house a telephone instrument with connecting wires intends to project his voice to those quite outside, and that the wires beyond his house and messages while passing over them are not within the protection of the Fourth Amendment. Here those who intercepted the projected voices were not in the house of either party to the conversation." *Id.,* at 466.

The disingenuous artificiality of this analysis is surely plain. Although, arguably, face-to-face conversations in home or office are more intimately a part of the right to privacy than are telephonic conversations, see pp. 452–453, *supra,* any attempt to draw a constitutional distinction would ignore the plain realities of modern life, in which the telephone has assumed an indispensable role in free human communication.

sapped by subsequent decisions of the Court, and that it and the cases following it are sports in our jurisprudence which ought to be eliminated.

(1) *Olmstead*'s illiberal interpretation of the Fourth Amendment as limited to the tangible fruits of actual trespasses was a departure from the Court's previous decisions, notably *Boyd,* and a misreading of the history and purpose of the Amendment. Such a limitation cannot be squared with a meaningful right to inviolate personal liberty. It cannot even be justified as a "literal" reading of the Fourth Amendment. "In every-day talk, as of 1789 or now, a man 'searches' when he looks or listens. Thus we find references in the Bible to 'searching' the Scriptures (John V, 39); in literature to a man 'searching' his heart or conscience; in the law books to 'searching' a public record. None of these acts requires a manual rummaging for concealed objects. . . . [J]ust as looking around a room is searching, listening to the sounds in a room is searching. Seeing and hearing are both reactions of a human being to the physical environment around him—to light waves in one instance, to sound waves in the other. And, accordingly, using a mechanical aid to either seeing or hearing is also a form of searching. The camera and the dictaphone both do the work of the end-organs of an individual human searcher—more accurately." *United States* v. *On Lee,* 193 F. 2d 306, 313 (Frank, J., dissenting).

(2) As constitutional exposition, moreover, the *Olmstead* decision is insupportable. The Constitution would be an utterly impractical instrument of contemporary government if it were deemed to reach only problems familiar to the technology of the eighteenth century; yet the Court in *Olmstead* refused to apply the Fourth Amendment to wiretapping seemingly because the Framers of the Constitution had not been farsighted enough to foresee the invention of the telephone.

(3) The Court's illiberal approach in *Olmstead* was a deviant in the law of the Fourth Amendment and not a harbinger of decisional revolution. The Court has not only continued to reiterate its adherence to the principles of the *Boyd* decision, see, *e. g.*, *Mapp* v. *Ohio, supra,* but to require that subpoenas *duces tecum* comply with the Fourth Amendment, see *United States* v. *Bausch & Lomb Optical Co.,* 321 U. S. 707, 727–728; *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186; *McPhaul* v. *United States,* 364 U. S. 372, 382–383—a requirement patently inconsistent with a grudging, narrow conception of "searches and seizures."

(4) Specifically, the Court in the years since *Olmstead* has severed both supports for that decision's interpretation of the Fourth Amendment. We have held that the fruits of electronic surveillance, though intangible, nevertheless are within the reach of the Amendment. *Irvine* v. *California,* 347 U. S. 128; *Silverman* v. *United States,* 365 U. S. 505; [9] *Lanza* v. *New York,* 370 U. S. 139, 142. Indeed, only the other day we reaffirmed that verbal fruits, equally with physical, are within the Fourth. *Wong Sun* v. *United States,* 371 U. S. 471, 485–486. So too, the Court has refused to crowd the Fourth Amendment into the mold of local property law, *Chapman* v. *United. States,* 365 U. S. 610, 617; *Jones* v. *United States,* 362 U. S. 257, 266; *United States* v. *Jeffers,* 342 U. S. 48; *McDonald*

---

[9] In *Irvine* v. *California, supra,* though the conduct of the police was held to violate the Fourth and Fourteenth Amendments, the fruits were deemed admissible under the rule of *Wolf* v. *Colorado, supra,* overruled in *Mapp* v. *Ohio, supra.* It might be noted that the holdings in *Irvine* and *Silverman,* insofar as they brought verbal fruits within the Fourth Amendment, were implicit in *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385, 392, where it was held that all fruits of an unconstitutional search must be excluded from the federal courts, so as not to "reduce . . . the Fourth Amendment to a form of words." Cf. *McDonald* v. *United States,* 335 U. S. 451; *Nueslein* v. *District of Columbia,* 73 App. D. C. 85, 115 F. 2d 690.

v. *United States,* 335 U. S. 451, 454, and has expressly held, in a case very close on its facts to that at bar, that an actual trespass need not be shown in order to support a violation of the Fourth Amendment. *Silverman* v. *United States, supra,* at 511.[10]

(5) Insofar as *Olmstead* rests on the notion that the federal courts may not exclude evidence, no matter how

---

[10] *Silverman* involved the penetration of a "spike mike" several inches into the party wall of the house occupied by the petitioners. The mike touched a heating duct which acted as a conductor of sounds within the house, thus enabling their transmission by the mike to federal officers on the other side of the wall. On its facts the case was very close to *Goldman,* which had involved a detectaphone placed against and touching (but not penetrating) the outside of a wall. Since the Court in *Silverman* declined to distinguish the cases on the ground that *Silverman* did, and *Goldman* did not, involve an actual trespass, it would seem that the authority of *Goldman* was severely impaired—and so also, it would seem, that of *On Lee* and *Olmstead.*

Actually, the instant case and *On Lee,* compared with *Goldman* and *Silverman,* are *a fortiori* for applying the Fourth Amendment:

"This Court has held generally that, in a federal criminal trial, a federal officer may testify to what he sees or hears take place within a house or room which he has no warrant or permission to enter, provided he sees or hears it outside of those premises. . . . This holds true even where the officer supplements his hearing with a hearing aid, detectaphone or other device outside the premises. . . . He and his hearing aid pick up the sounds outside of, rather than within, the protected premises.

"In the instant case [*On Lee*] . . . Lee's overhearing of petitioner's statements was accomplished through Chin Poy's surreptitious introduction, within petitioner's laundry, of Lee's concealed radio transmitter which, without petitioner's knowledge or consent, *there* picked up petitioner's conversation and transmitted it to Lee outside the premises. The presence of the transmitter, for this purpose, was the presence of Lee's ear. . . . In this case the words were picked up without warrant or consent *within* the constitutionally inviolate 'house' of a person entitled to protection there against unreasonable searches and seizures . . . ." *On Lee* v. *United States,* 343 U. S. 747, 766–767 (Burton, J., dissenting).

obtained, unless its admission is specifically made illegal by federal statute or by the Constitution, the decision is manifestly inconsistent with what has come to be regarded as the scope of the supervisory power over federal law enforcement. See, *e. g.*, *McNabb* v. *United States*, 318 U. S. 332; *Upshaw* v. *United States*, 335 U. S. 410; *Rea* v. *United States*, 350 U. S. 214; *Mallory* v. *United States*, 354 U. S. 449; Morgan, The Law of Evidence, 1941–1945, 59 Harv. L. Rev. 481, 537 (1946). We are empowered to fashion rules of evidence for federal criminal trials in conformity with "the principles of the common law as they may be interpreted . . . in the light of reason and experience." Rule 26, Federal Rules of Criminal Procedure. Even if electronic surveillance as here involved does not violate the letter of the Fourth Amendment, which I do not concede, it violates its spirit, and we ought to devise an appropriate prophylactic rule. The Court's suggestion that the supervisory power may never be invoked to create an exclusionary rule of evidence unless there has been a violation of a specific federal law or rule of procedure is, to me, a gratuitous attempt to cripple that power. And I do not see how it can be reconciled with our mandate to fashion rules conformable to evolving common law principles.

(6) The *Olmstead* decision caused such widespread dissatisfaction that Congress in effect overruled it by enacting § 605 of the Federal Communications Act, which made wiretapping a federal crime. We have consistently given § 605 a generous construction, see *Nardone* v. *United States*, 302 U. S. 379; *Weiss* v. *United States*, 308 U. S. 321; *Nardone* v. *United States*, 308 U. S. 338; *Benanti* v. *United States*, 355 U. S. 96, recognizing that Congress had been concerned to prevent "resort to methods deemed inconsistent with ethical standards and destructive of personal liberty." *Nardone* (I), *supra*, at 383; see *Goldstein* v. *United States*, 316 U. S. 114, 120. To be sure,

§ 605, being directed to the specific practice sanctioned by *Olmstead*, wiretapping, does not of its own force forbid the admission in evidence of the fruits of other techniques of electronic surveillance. But a congressional enactment is a source of judicial policy as well as a specific mandate to be enforced, and the same "broad considerations of morality and public well-being," *Nardone* (II), at 340, which make wiretap evidence inadmissible in the federal courts equally justify a court-made rule excluding the fruits of such devices as the Minifon. It is anomalous that the federal courts, while enforcing the right to privacy with respect to telephone communications, recognize no such right with respect to communications wholly within the sanctuaries of home and office.

## IV.

If we want to understand why the Court, in *Olmstead*, *Goldman*, and *On Lee*, carved such seemingly anomalous exceptions to the general principles which have guided the Court in enforcing the Fourth Amendment, we must consider two factors not often articulated in the decisions. The first is the pervasive fear that if electronic surveillance were deemed to be within the reach of the Fourth Amendment, a useful technique of law enforcement would be wholly destroyed, because an electronic "search" could never be reasonable within the meaning of the Amendment. See Note, The Supreme Court, 1960 Term, 75 Harv. L. Rev. 40, 187 (1961). For one thing, electronic surveillance is almost inherently indiscriminate, so that compliance with the requirement of particularity in the Fourth Amendment would be difficult; for another, words, which are the objects of an electronic seizure, are ordinarily mere evidence and not the fruits or instrumentalities of crime, and so they are impermissible objects of lawful searches under any circumstances, see pp. 456–457, *supra;* finally, the usefulness of electronic surveillance depends on lack of notice to the suspect.

But the argument is unconvincing. If in fact no warrant could be devised for electronic searches, that would be a compelling reason for forbidding them altogether. The requirements of the Fourth Amendment are not technical or unreasonably stringent; they are the bedrock rules without which there would be no effective protection of the right to personal liberty. A search for mere evidence offends the fundamental principle against self-incrimination, as Lord Camden clearly recognized; a merely exploratory search revives the evils of the general warrant, so bitterly opposed by the American Revolutionaries; and without some form of notice, police searches became intolerable intrusions into the privacy of home or office. Electronic searches cannot be tolerated in the name of law enforcement if they are inherently unconstitutional.

But in any event, it is premature to conclude that no warrant for an electronic search can possibly be devised. The requirements of the Fourth Amendment are not inflexible, or obtusely unyielding to the legitimate needs of law enforcement. It is at least clear that "the procedure of antecedent justification before a magistrate that is central to the Fourth Amendment," *Ohio ex rel. Eaton* v. *Price,* 364 U. S. 263, 272 (separate opinion); see *McDonald* v. *United States,* 335 U. S. 451, 455; *Abel* v. *United States,* 362 U. S. 217, 251–252 (dissenting opinion), could be made a precondition of lawful electronic surveillance. And there have been numerous suggestions of ways in which electronic searches could be made to comply with the other requirements of the Fourth Amendment.[11]

---

[11] See, *e. g., Goldman* v. *United States,* 316 U. S. 129, 140, n. 6 (Murphy, J., dissenting); cf. 8 Wigmore, Evidence (McNaughton rev. ed. 1961), § 2184b (3), at 59; Westin, The Wire-Tapping Problem: An Analysis and a Legislative Proposal, 52 Col. L. Rev. 165, 200–208 (1952).

This is not to say that a warrant that will pass muster can actually be devised. It is not the business of this Court to pass upon hypothetical questions, and the question of the constitutionality of warrants for electronic surveillance is at this stage purely hypothetical. But it is important that the question is still an open one. Until the Court holds inadmissible the fruits of an electronic search made, as in the instant case, with no attempt whatever to comply with the requirements of the Fourth Amendment, there will be no incentive to seek an imaginative solution whereby the rights of individual liberty and the needs of law enforcement are fairly accommodated.

The second factor that may be a significant though unarticulated premise of *Olmstead* and the cases following it is well expressed by the Government in the instant case: "if the agent's relatively innocuous conduct here is found offensive, *a fortiori*, the whole gamut of investigatorial techniques involving more serious deception must also be condemned. Police officers could then no longer employ confidential informants, act as undercover agents, or even wear 'plain clothes.'" But this argument misses the point. It is not Agent Davis' deception that offends constitutional principles, but his use of an electronic device to probe and record words spoken in the privacy of a man's office. For there is a qualitative difference between electronic surveillance, whether the agents conceal the devices on their persons or in walls or under beds, and conventional police stratagems such as eavesdropping and disguise. The latter do not so seriously intrude upon the right of privacy. The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak. But as soon as electronic surveillance comes into play, the

risk changes crucially. There is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy. See pp. 449-451, *supra*.[12]

Furthermore, the fact that the police traditionally engage in some rather disreputable practices of law enforcement is no argument for their extension. Eavesdropping was indictable at common law[13] and most of us would still agree that it is an unsavory practice. The limitations of human hearing, however, diminish its potentiality for harm. Electronic aids add a wholly new dimension to eavesdropping. They make it more penetrating, more indiscriminate, more truly obnoxious to a free society. Electronic surveillance, in fact, makes the police omniscient; and police omniscience is one of the most effective tools of tyranny.

## V.

The foregoing analysis discloses no adequate justification for excepting electronic searches and seizures from the requirements of the Fourth Amendment. But to state the case thus is to state it too negatively. It is to ignore the positive reasons for bringing electronic-surveillance under judicial regulation. Not only has the

---

[12] This is not to say that the Fourth Amendment must necessarily embrace every situation involving electronic recording aids to law enforcement. For example, a distinction might be drawn between surveillance of home or office on the one hand, and surveillance of public places, streets, and so forth, on the other hand. Compare *McDonald* v. *United States*, 335 U. S. 451, with *Hester* v. *United States*, 265 U. S. 57.

[13] *"Eaves-droppers,* or such as listen under walls or windows or the eaves of a house, to hearken after discourse, and thereupon to frame slanderous and mischievous tales, are a common nuisance and presentable at the court-leet: or are indictable at the sessions, and punishable by fine and finding sureties for their good behaviour." 4 Blackstone Commentaries 168. See Ga. Code Ann. § 26-2001; N. D. Cent. Code § 12-42-05; S. C. Code § 16-554.

problem grown enormously in recent years, see, *e. g.,* *Todisco* v. *United States,* 298 F. 2d 208; *United States* v. *Kabot,* 295 F. 2d 848, but its true dimensions have only recently become apparent from empirical studies not available when *Olmstead, Goldman,* and *On Lee* were decided. The comprehensive study by Samuel Dash and his associates as well as a number of legislative inquiries [14] reveals these truly terrifying facts: (1) Electronic eavesdropping by means of concealed microphones and recording devices of various kinds has become as large a problem as wiretapping, and is pervasively employed by private detectives, police, labor spies, employers and others for a variety of purposes, some downright disreputable.[15] (2) These devices go far beyond simple

---

[14] Dash, Schwartz, and Knowlton, The Eavesdroppers (1959); Hearings on S. Res. No. 234 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 85th Cong., 2d Sess. *passim* (1958); Report of the California Senate Judiciary Committee on the Interception of Messages by the Use of Electronic and Other Devices (1957); Report of the New York Joint Legislative Committee to Study Illegal Interception of Communications, N. Y. Sess. Laws (1956).

[15] See Dash, *supra,* note 14, at 76 ("bugging" by police of interrogation rooms, jail cells, and interview rooms in jails), 96 (monitoring of employees' conversations by means of microphones concealed in pen sets), 136 (use of microphones by law enforcement officers termed "universal" in New Orleans and Baton Rouge), 175 (in California, "[b]ugging is much more frequently and openly engaged in by police than wiretapping"), 180 (again in California: "Literally, whenever the police suspected an individual of being connected with the commission of a crime, and the case was worth it, trained police technicians, or private specialists employed by the police, would pry open windows, pick locks, or by some ruse gain entry to the home or business place of the suspected individual and plant a microphone for the purpose of overhearing his conversations. By means of a leased wire from the telephone company, these planted microphones could be connected to telephone lines which would be drawn in to a single listening post where a great number of conversations in different parts of the city could be monitored at one time and in one place"), 190 (use of cor- *i*

"bugging," and permit a degree of invasion of privacy that can only be described as frightening.[16] (3) Far from providing unimpeachable evidence, the devices lend themselves to diabolical fakery.[17] (4) A number

cealed microphone for purposes of blackmail), 196 (bugging conversations between husbands and wives in jails), 212 ("tables have been bugged in a restaurant for the purpose, according to the proprietor, of permitting him to know what his customers actually think of his food and to detect discourtesy among his waitresses"), 229–230 (use of bugging to obtain evidence for divorce proceedings), 269–271 (wiretapping and bugging of labor controversies in Philadelphia), 280–281 (in Las Vegas: "A bug is put in a visiting hoodlum's hotel room as a matter of course, to see what he is up to"). These are, of course, only a few isolated examples of the practice; see, e. g., The Wall Street Journal, April 9, 1963, p. 1, col. 4; p. 22, col. 3.

[16] Dash suggests that a parabolic microphone (which concentrates sound much as a curved mirror focuses light) might pick up a conversation at a distance of 100 feet. P. 350. Such a microphone can be made virtually impossible to detect, p. 353, but even the ordinary concealed microphone in the home may be impossible to detect, at least without a mine detector. P. 342. Dash also suggests that a microwave-beam device may have been developed with a range of 1,000 feet or more and ability to penetrate through virtually any obstacle. Pp. 357–358. Such a device, if it exists, is not readily obtainable; but the parabolic microphone and a variety of other such devices are. Thus a current advertisement in a national magazine for "The Snooper" describes this device as follows: "This is literally an electronic marvel that's a direct result of the space age. Incredible as it may seem, it does amplify sound 1,000,000 times. Sensitive 18″ disk reflector will pick up normal conversations at a distance (500 ft.) where you can't even see lips moving. Just think of the ways you can use this. Portable; complete with tripod and stethescopic earphones. The best part—a regular tape recorder can be plugged into the back to take everything down. Have fun!" The advertised price is $18.95.

[17] "In a carefully controlled experiment, Samuel Dash made a sample political speech on tape. A sound studio specializing in tape editing for one of the large broadcasting studios then took this tape and edited it in such a way as completely to reverse its meaning. Finally, a third recording was made, this time of Mr. Dash reading the new, distorted version of the speech. The three recordings were

of States have been impelled to enact regulatory legislation.[18]   (5) The legitimate law enforcement need for such techniques is not clear,[19] and it surely has not been established that a stiff warrant requirement for electronic surveillance would destroy effective law enforcement.

But even without empirical studies, it must be plain that electronic surveillance imports a peculiarly severe danger to the liberties of the person.   To be secure against police officers' breaking and entering to search for physical objects is worth very little if there is no security against the officers' using secret recording devices to purloin words spoken in confidence within the four walls of home or office.   Our possessions are of little value compared to our personalities.   And we must bear in mind that

---

compared by ear and by oscilloscope to see whether or not the editing was detectable.   By ear it was noticeable only in one place where the editor had been hurried in his work.   The oscilloscope could not reveal even this much because of the rapidly changing patterns on the screen.   It was decided that the only way to examine the waveforms for purposes of comparison was to record them on motion-picture film; accordingly, equipment was set up for doing this.   Although it was expected that the build-up or decay of sounds would be altered by cutting, so skilful had been the editorial manipulation that nothing of the kind was observed.   Even after hours of studying the films, no sure clue revealing an editing job could be found." Dash, at 368.

[18] Cal. Penal Code §§ 653h, 653i; Mass. Gen. Laws Ann., c. 272, § 99; Nev. Rev. Stat. § 200.650; N. Y. Penal Law, § 738.

[19] In the nature of things, wiretapping is only useful in the investigation of crimes of a continuing nature, which are typically not major crimes.   "[T]he wiretapping done by plainclothesmen is still in large part aimed at bookmakers' operations and prostitution.   As a matter of fact, more wiretapping by police is done in gambling cases than in any other kind of case.   In gambling and in vice matters generally, there is steady pressure on the plainclothesmen to maintain a certain arrest record.   Continuous wiretap surveillance, without court order, enables plainclothesmen to maintain this record." Dash, at 66.   The same principles apply to electronic surveillance generally.

historically the search and seizure power was used to suppress freedom of speech and of the press, see Lasson, *supra,* at 33, 37–50; *Marcus* v. *Search Warrant,* 367 U. S. 717, 724–729; *Frank* v. *Maryland,* 359 U. S. 360, 376 (dissenting opinion), and that today, also, the liberties of the person are indivisible. "Under Hitler, when it became known that the secret police planted dictaphones in houses, members of families often gathered in bathrooms to conduct whispered discussions of intimate affairs, hoping thus to escape the reach of the sending apparatus." *United States* v. *On Lee,* 193 F. 2d 306, 317 (dissenting opinion). Electronic surveillance strikes deeper than at the ancient feeling that a man's home is his castle; it strikes at freedom of communication, a postulate of our kind of society. Lopez' words to Agent Davis captured by the Minifon were not constitutionally privileged by force of the First Amendment. But freedom of speech is undermined where people fear to speak unconstrainedly in what they suppose to be the privacy of home and office. King, Wire Tapping and Electronic Surveillance: A Neglected Constitutional Consideration, 66 Dick. L. Rev. 17, 25–30 (1961). If electronic surveillance by government becomes sufficiently widespread, and there is little in prospect for checking it, the hazard that as a people we may become hagridden and furtive is not fantasy.

The right to privacy is the obverse of freedom of speech in another sense. This Court has lately recognized that the First Amendment freedoms may include the right, under certain circumstances, to anonymity. See *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449; *Bates* v. *Little Rock,* 361 U. S. 516; *Talley* v. *California,* 362 U. S. 60; *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293; *Gibson* v. *Florida Legislative Investigation Comm.,* 372 U. S. 539. The passive and the quiet, equally with the active and the aggressive, are entitled to protection when engaged in the precious activity of expressing ideas

or beliefs. Electronic surveillance destroys all anonymity and all privacy; it makes government privy to everything that goes on.

In light of these circumstances I think it is an intolerable anomaly that while conventional searches and seizures are regulated by the Fourth and Fourteenth Amendments and wiretapping is prohibited by federal statute, electronic surveillance as involved in the instant case, which poses the greatest danger to the right of private freedom, is wholly beyond the pale of federal law.[20]

This Court has by and large steadfastly enforced the Fourth Amendment against physical intrusions into person, home, and property by law enforcement officers. But our course of decisions, it now seems, has been outflanked by the technological advances of the very recent past. I cannot but believe that if we continue to condone electronic surveillance by federal agents by permitting the fruits to be used in evidence in the federal courts, we shall be contributing to a climate of official lawlessness and conceding the helplessness of the Constitution and this Court to protect rights "fundamental to a free society." *Frank* v. *Maryland, supra,* at 362.[21]

---

[20] Senator Hennings has termed electronic eavesdropping more insidious and more prevalent than wiretapping. The Wiretapping-Eavesdropping Problem: A Legislator's View, 44 Minn. L. Rev. 813, 815 (1960). Another observer has called the problem "far graver" than wiretapping. Williams, The Wiretapping-Eavesdropping Problem: A Defense Counsel's View, 44 Minn. L. Rev. 855, 862 (1960).

[21] Viewing the instant case as I do, I find no occasion to consider the petitioner's defense of entrapment.