THE STATE OF OHIO *v.* PONEY.

(No. 229692—Decided December 8, 1966.)

Juvenile Court of Cuyahoga County.

*Mr. John T. Corrigan*, prosecuting attorney, and *Mr. William Coyne*, for plaintiff.

*Mr. M. Q. Critchfield* and *Mr. S. W. Lustig*, for defendant.

GAGLIARDO, Judge. The defendant was charged under Section 2151.41, Revised Code, with acting in a way tending to cause the delinquency of one Kathie Carlson, a minor female, 16 years of age, and was found guilty as charged by a jury on December 8, 1966.

The affidavit, following the usual form, contained the following language: "that on or about the 31st day of December, 1965, to wit: on or about 14th day of January, 1966, in the county of Cuyahoga aforesaid, one Andrew Poney, being an adult male person, age 46 years, did unlawfully act in a way tending to cause delinquency in one Kathie Carlson, a child, age 16 years, on occasions during the aforesaid period, in this to wit: He did on occasions during the aforesaid period make indecent and improper proposals and suggestions to the said child, Kathie Carlson, age 16 year. * * *"

A motion for a bill of particulars was timely filed on April 8, 1966, under Section 2941.07, Revised Code, and the state supplied a bill of particulars as follows: "In answer for specifics as to the nature of the offense charged, the prosecuting attorney says that the defendant, Andrew Poney, age 46, while hired as a driving instructor did make indecent and improper proposals to Kathie Carlson, age 16, while he was alone with her in the driver training car. That the defendant engaged in lengthy conversations with Kathie Carlson on or about December 31, 1965, January 4, 1966, January 5, 1966, January 13, 1966 and January 14, 1966, at which times the indecent and improper proposals were made. As a result of these conversations the defendant, an adult did unlawfully act in a way tending to cause delinquency in one Kathie Carlson, a minor."

The defendant then moved for a more specific bill of particulars on the grounds that the bill of particulars filed was inadequate in that it did not specify the language actu-

ally uttered by the defendant. This motion was denied as not being timely made and that the affidavit as supplemented by the bill of particulars adequately advised the defendant of the nature of the charge against him.

The defendant then moved for discharge on the grounds that the affidavit did not state an offense, was too vague and uncertain and did not charge intent. Motion to dismiss the affidavit was denied. "A penal statute which describes the offense with reasonable certainty is not void for uncertainty." *State* v. *Coterel* (1953), 97 Ohio App. 48, leave to appeal denied, 162 Ohio St. 112.

The provision of Section 1639-45, General Code (now Section 2151.41, Revised Code), in which acting in a way tending to cause delinquency is an offense "'* * * is not void for uncertainty and does not lack uniform operation. * * *'" "Intent is not an element of the offense of acting in a way tending to cause the delinquency of a minor." (*State* v. *Hannawalt*, 26 Ohio Law Abs. 641.)

TESTIMONY

The matter then proceeded to trial before a jury. The minor testified that: On the December 31st, 1965 driving lesson the following conversation took place:

"Q. All right. And during the course of that lesson on that particular date, other than the normal driving instructions that you were given, did any unusual conversation take place? A. Well, he said I should take up dramatics and that I was pretty, and that I should study to be a model.

"Q. All right. And what time did that lesson end? A. They were two-hour lessons. At 4:30.

"Q. Where would you be dropped off at? A. My home."

That at the driving lesson on January 4, 1966, the following conversation took place:

"Q. Now, referring your recollection to January 4, 1966, tell us whether or not you had another lesson that particular date? A. Yes.

"Q. And what time did that lesson start, do you recall? A. 4:45.

"Q. And where were you picked up that day? A. My home.

"Q. Was Mr. Poney the instructor on that lesson too? A. Yes.

"Q. All right. Now, during that particular lesson, other than the normal conversations pertaining to your instructions and lesson, was there any unusual conversations? A. Yes.

"Q. And can you tell the court and jury what that was, please? A. He asked me if I ever had a love affair. I told my mother.

"Q. What did you tell him? A. I told him that I was never ashamed of anything that I had ever done.

"Q. Did he say anything else unusual to you on that particular occasion? A. Yes, he asked me if I liked older men.

"Q. And was anything else said during this lesson? A. Not that I can remember."

That at the driving lesson on January 5, 1966, the following conversation took place:

"Q. All right. Now, referring your recollection to January 5, 1966, did you have a lesson that day? A. Yes.

"Q. What time did your lesson start on that day? A. 4:45.

"Q. And other than your normal driving instructions and lessons, did any unusual conversation take place on this lesson? A. Yes.

"Q. And would you tell us what that was? A. He told me he would like to love the hell out of me, and— he said that I had kissable lips, that he could tell by looking at them, and he said that he wished that he had eyes like I do to make me want him like he wants me.

"Q. And tell us whether or not there was any instructions as to any specific type of driving during this lesson? A. Yes. He asked me if I ever drove one handed, and I said, no, because I had never driven before, and he says, 'Well, take hold of the wheel with your left hand put your right hand down at your side,' so I did, and he held my right hand, and then he says, 'O. K. now, switch.' So I put my

right hand on the wheel and took my left hand off, and he held my right hand on the wheel.

"Q. And was anything else unusual said during—tell us whether or not you had occasion to stop anywhere during this drive? A. Yes.

"Q. And where was that, if you recall? A. I don't know the place, but he said it was his sister's house, and we had stopped there to check his calls to see if there were any calls that came in.

"Q. And when he come out, did anything unusual take place? A. Just—no, small conversation, and he said things like I was pretty.

"Q. And did he have anything with him when he came out of the house? A. Well, when he left he had a tape recorder with him.

"Q. Now, was there any conversation pertaining to a picture on this occasion? A. Yes.

"Q. And what was that? A. He took this picture out of his wallet, He says, 'What do you think of this man?' And I said he wasn't bad looking. And he says, 'Good. That is me.'

"Q. Was this a picture of a younger man? A. Yes, he was about 20.

"Q. Now, you mentioned a tape recorder. Where was this at in the car? A. He held it in his hand.

"Q. And this was on which date? A. 4th and 5th.

"Q. On January 4th and 5th? A. Yes.

"Q. He had a recorder? A. Yes.

"Q. And did he use this recorder for anything in your presence? A. Yes.

"Q. And describe how that was used. A. Well, when he was teaching me how to drive, he would record our conversation, and then when we would stop by the house, he would play it back so I could learn all my mistakes so I wouldn't forget them.

"Q. And when you had the conversation pertaining to him wanting to love you and your looks and that type of thing, was the recorder on then? A. No.

"Q. Would he turn it off then? A. Yes."

On January 13, 1966, the following conversation took place?

"Q. And on this particular day, other than the normal driving lesson, was anything else unusual said? A. We were at Parmatown, and he was teaching me how to park, and he asked me if I wanted to go behind Byer's Field in Parma and make love with him.

"Q. All right. And was any unusual conversation taking place on this particular lesson—by the way, did you have the recorder on when this was said? A. Yes.

"Q. And other than this, was there any other unusual conversation on the 13th? A. Not that I can remember.

"Q. And what did you say to him in answer to his question, by the way? A. I didn't answer him. I just laughed it off."

On January 14, 1966, the following conversation took place:

"Q. Now, on January 14th did you again have a driver's lesson? A. Yes.

"Q. And I assume Mr. Poney was the instructor on that lesson? A. Yes.

"Q. Before he arrived, did you see any member of the Parma Police Department? A. Yes.

"Q. And who was that? A. Detective Eschweiler and Mrs. Bejcek.

"Q. And where did you see them? A. They were at my home.

"Q. What happened while they were there? A. They gave me a tape recorder to put in my purse.

"Q. All right. And did you put this recorder in your purse? A. Yes.

"Q. And will you describe for the jury just basically how big this little recorder is? A. It was about this big; about that high, and it had a pencil connected for the microphone.

"Q. And how did the microphone—would you describe that just briefly for us; where was that put? A. It was lashed on the outside.

"Q. Lashed on the outside of the purse? A. Purse, yes.

"Q. And did Mr. Poney pick you up at your home on this day? A. Yes.

"Q. And on this particular instruction, other, again, than the normal instruction about driving, did any unusual conversation take place? A. I don't remember.

"Q. Well, can you tell us whether or not there was any conversation pertaining to parking again at the Parma football field on this occasion? A. Yes, he asked me—

"Q. You may answer. A. He asked me if I wanted to go behind Byer's Field and make love with him, and he asked me if I wanted to park with him, and I answered no to his question.

"Q. Who was driving at this time? A. I was.

"Q. Did you in fact drive behind Parma Field? A. No.

"Q. And, by the way, during this particular conversation, did you have the recorder on, that you described, on your person? A. Yes.

"Q. You did? A. Yes."

Two police officers from the Parma Police Department testified that on January 5, 13 and 14, they had furnished Kathie Carlson with an electronic recording device, followed and observed her during the entire course of the driving lessons and that they had received the tapes immediately upon her return to her home, then proceeded directly to the police station, a short distance away. The tapes were played and corroborated the testimony of the minor. The defendant testified that the testimony of the minor was essentially correct but offered in his defense the explanation that the minor had instigated the conversation and that he made the remarks in order to relax the minor who was nervous, so that she might receive maximum benefits from the driving lessons.

A motion to suppress evidence secured by means of an electronic recording device secreted in the purse of the minor furnished by the Parma Police Department and tes-

timony of the police as to the conversations recorded on the tapes on the grounds of having been secured as a result of an illegal search and seizure in violation of the Fourth Amendment of the U. S. Constitution was filed and hearing had prior to trial.

The evidence disclosed that the minor advised her parents after the third driving lesson that the defendant had made certain remarks to her during the course of her driving lesson which alarmed and disturbed her and that she wished to discontinue her instructions. The parents reported this to the Parma Police who advised the minor to resume her driving lessons and furnished her a tape recording device which she was instructed to secrete in her purse so that any further conversations could be recorded. In addition arrangements were made for the police to keep her under surveillance while she was taking her driving lessons so that no harm would befall her. Subsequently this plan was followed and after the lessons on January 13th and 14th immediately upon her return home, the tapes were taken by the police officers to the Parma Police Station a short distance away and upon arrival at the station immediately played and listened to by the police officers and then secured.

The motion to suppress was overruled by the trial court on authority of *Lopez* v. *United States* (1963), 373 U. S. 427. "A wire recording of a conversation of a federal revenue agent and a defendant in the latter's office is admissible at defendant's trial on a charge of attempted bribery of the agent, where the recording device was used only to obtain the most reliable evidence possible of a conversation in which the agent was a participant and which that agent was fully entitled to disclose, and the device was not planted by means of an unlawful physical invasion of defendant's premises under circumstances which would violate the Fourth Amendment, but was carried in and out by the agent who was there with defendant's assent."

At the conclusion of all the testimony, the court

charged the jury and after the general instructions used the following language:

"Also, you must find that the acts complained of, namely, indecent and improper proposals and suggestions to the child, you must find that there were words, there were proposals and there were suggestions, because that *has not been disputed. The defendant admitted it.* But then you must go on and determine whether or not you consider these suggestions or proposals to be indecent or improper. You the jury must decide that."

"Then, if you find that the state has proven beyond a reasonable doubt that the proposals admittedly made by the defendant, the suggestions admittedly made by the defendant, were indecent and improper, whether or not these were of such a nature as to tend to cause the delinquency of a minor child. It is not necessary that a delinquency result, only that the acts complained have been of such a nature that it would have the tendency to cause a minor to become a delinquent. * * *"

"That the delinquency is sure to befall a certain child within a reasonable time."

Furthermore,

"* * * so that you have to find, and as I have instructed you, that the acts, the words, the proposals, the suggestions admittedly were made, you have to find whether or not they are indecent and improper, and whether they are of such a nature as could reasonably be certain to lead to the delinquency of a certain child. * * *"

*Judgment accordingly.*