No. A–335. HEUTSCHE v. UNITED STATES. C. A. 7th Cir. Application for bail presented to MR. JUSTICE REHNQUIST, and by him referred to the Court, denied.

MR. JUSTICE DOUGLAS, dissenting.

Mr. Justice Holmes in *Olmstead* v. *United States,* 277 U. S. 438, 470 (dissenting), called wiretapping "dirty business." That decision was rendered in 1928. Since that time "dirty business" has become the apt phrase describing the regime under which we now live. The warrant requirement which this Court imposed as a condition to that kind of surveillance, *Berger* v. *New York,* 388 U. S. 41, and the Act of Congress which implemented that decision, 18 U. S. C. §§ 2510–2520; *United States* v. *U. S. District Court,* 407 U. S. 297, have been flouted. We who live in the District of Columbia know that electronic surveillance is commonplace. I am indeed morally certain that the Conference Room of this Court has been "bugged"; and President Johnson during his term in the White House asserted to me that even his phone was tapped.

We deal with a disease that has permeated our society. Certainly Ms. Heutsche is an "aggrieved" person within the meaning of 18 U. S. C. § 3504 (a)(1).[1] That section

---

[1] "§ 3504. (a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—

"(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act . . . ."

does not restrict its protection to conversations of an accused. It should be liberally construed as it deals with the right of privacy protected by the Fourth Amendment. The conversation of one's lawyer over the telephone may be as helpful to Big Brother as the conversation of the accused herself. The lawyer preparing the defense may in his telephone conversations reveal concessions made by the accused or his trial strategy or clues to the defense which will be proffered that may be extremely helpful to the prosecution. If electronic surveillance were strictly employed by the Executive Branch, we might be chary of enlarging its duties as requested here. But since we live in a regime where the "dirty business" of wiretapping runs rampant, I would apply the statute liberally to check the disease which almost every newspaper tells us has poisoned our body politic.

We are told that in this case the applicant's lawyers did discuss her case with persons other than herself over the telephone. Is Big Brother to have a ringside seat where he can listen to all the confidences of lawyers who defend an accused? If so, what happens to the valued right of counsel protected by the Sixth Amendment?

On June 26, 1972, Margaret Heutsche, the applicant herein, was arrested by the FBI on charges relating to the removal and destruction of Government property from a Selective Service System office. Although a preliminary hearing resulted in a finding of probable cause, she remained free on her own recognizance and heard nothing further on the case until called to testify before a federal grand jury nearly a year later. When she invoked her constitutional right to refrain from testifying, the Government obtained a grant of use immunity pursuant to 18 U. S. C. § 6002 and an order from the District Court compelling the applicant to testify. The

applicant again refused to testify and sought reconsideration of the District Court order, claiming that the subpoena and the questions propounded by the grand jury were the product of illegal electronic surveillance of her and that the Government had not properly affirmed or denied that claim as required by 18 U. S. C. § 3504.[2] She claims that the same barrier extends to her lawyer. The applicant also moved for a disclosure of any electronic surveillance of her attorneys and their consultants, and for an evidentiary hearing on the sufficiency of the disclosure.

In response to the motions, the Government filed the affidavit of a high Justice Department official to the effect that, based on an inquiry addressed to seven federal agencies: [3]

"[T]here has been no electronic surveillance occurring on premises known to have been owned, leased or licensed by Margaret Ann[e] Heutsche.

"The deponent further states that there was no electronic surveillance directed against Margaret Ann[e] Heutsche, *per se,* and there have been no known overhearings by electronic surveillance, at any location, of conversations to which Margaret Ann[e] Heutsche was a party."

The applicant maintained that the surveillance denial was inadequate for, *inter alia,* failing to deny electronic surveillance of her attorneys and their associates and consultants which may have yielded conversations concerning her case. The applicant submitted affidavits

[2] See n. 1, *supra.*

[3] The widespread use of electronic surveillance is demonstrated by the list of agencies consulted before making the denial: FBI; Bureau of Narcotics and Dangerous Drugs; Secret Service; IRS; Customs; Bureau of Alcohol, Tobacco and Firearms; and the Postal Service.

from several attorneys and consultants who swore that they discussed her case among themselves over phone lines on which all had been experiencing strange and suspicious problems.[4] On the basis of these affidavits the applicant requested an evidentiary hearing as to illegal electronic surveillance. The District Court denied relief and, upon the applicant's further refusal to testify, the Government moved that she be adjudged in contempt and ordered committed. Applicant submitted further affidavits and moved to cross-examine the Justice Department official who denied the existence of electronic surveillance.

The District Court again denied her motions and held applicant in contempt, ordering her submitted to the custody of the United States Marshal. The Court of Appeals affirmed, finding that the applicant had made no showing which would require the Government to make an investigation of electronic surveillance of her attorneys. The case is before this Court on the application of Ms. Heutsche to be released from custody pending review here of the decision of the Court of Appeals. The applicable standard for the relief sought is found in 28 U. S. C. § 1826 (b), which directs denial only if the issues are frivolous or the appeal is taken for purposes of delay.

I cannot agree that the applicant's showing is not sufficient *at least* to entitle her to an evidentiary hearing. In a country where the Government overhears

---

[4] At various times the affiants had difficulty placing calls, heard clicking noises over the lines, and heard strange voices and the sound of tape recorders in the background. In addition, a consultant with a Ph. D. in physics conducted relative field strength tests on the phone line of one of the attorneys and stated his belief that a radio frequency monitoring system had been applied to the line.

over 500,000 conversations a year pursuant to court authorized wiretaps alone,[5] it is difficult to gainsay anyone's fear of the intrusion of Big Brother's ear. The daily news brings fresh evidence to make a reality of Mr. Chief Justice Warren's warning that the "fantastic advances in the field of electronic communication constitute a great danger to the privacy of the individual . . . ." [6] In such circumstances the Govern-

---

[5] Administrative Office of the United States Courts, Report on Applications for Orders Authorizing or Approving the Interception of Wire or Oral Communications, Table 4 (1972).

In 1954 I stated that:

"During 1952, there were in New York City alone at least 58,000 orders issued which allowed wiretapping—over 150 a day every day in the year. The New York system has in practice been oppressive; it has been used as the means whereby police have obtained guarded confidences of people and used the information for corrupt purposes." W. Douglas, An Almanac of Liberty 355 (1954).

After reading this statement District Attorney Edward Silver of New York attempted to obtain wiretap data from District Attorneys and police. He reported to the House Judiciary Committee that the total was only 480. Hearings on H. R. 762 before Subcommittee No. 5 of the House Committee on the Judiciary, 84th Cong., 1st Sess., 99 (1955). The Committee called Sidney Davis, former Law Clerk for Mr. Justice Black and the New York attorney who had helped me on the study. He testified as to a misunderstanding between us: there were not 58,000 orders but 58,000 taps, including illegal taps. *Id.,* at 203. District Attorney Frank Hogan of New York testified that claims of illegal wiretapping of such magnitude were "the cries of alarmists . . . who are inclined to . . . inflate incidents and conditions in order to sustain their arguments." *Id.,* at 322. But the "cries of alarm" proved realistic. In 1959, Samuel Dash, on the basis of extrapolations from man-hour statistics on policemen admittedly engaged in wiretapping activity, concludes that my estimates of that activity were "closer to the truth than the figures submitted by the police to [Edward Silver]." S. Dash, The Eavesdroppers 68–69 (1959).

[6] *Lopez* v. *United States,* 373 U. S. 427, 441 (1963) (concurring).

ment's claim that it should not be put to the task of searching its files for evidence of specific surveillance cannot be treated lightly. I take cognizance of the fact that the mass of aggregate data on the citizenry yielded in this Orwellian era may indeed make the task a difficult one.

But the difficulty which should concern us is that faced by the victim of illegal surveillance. How is the applicant in this case to establish the existence of such clandestine activity so expertly carried on by the Executive Branch? She has introduced sworn statements that her attorneys—themselves likely subjects of Government surveillance [7]—discussed her case over phone lines fraught with indicia of intrusion. She has introduced further sworn statements that electronic tests reveal a likelihood of such intrusion. Yet the court below held this insufficient even to require the Government to check its records on specific phone lines identified by the applicant.

The victims of illegal governmental surveillance are thus apparently faced with the insurmountable task of proving such surveillance before the Government will be asked to respond to allegations of its existence or participate in an evidentiary hearing to decide the matter. In seeking review of that holding the applicant raises serious issues of constitutional magnitude. She has alleged Government misconduct interfering not only with her right to privacy but with her right to the effec-

---

[7] Her attorneys include members of the San Francisco chapter of the National Lawyers Guild and an organization in Chicago known as the "Peoples Law Office." Peoples is a firm almost exclusively devoted to the criminal defense of "militants" and "radicals," including Chairman Fred Hampton of the Black Panther Party and Bernadine Dohrn and Marc Rudd of the Weatherman faction of the SDS.

tive assistance of counsel by destroying her attorneys' ability to discuss her case in confidence. Having shown all anyone will ever be able to show in this area prior to a Government response, she further questions how those constitutional rights have any meaning, when more is required before the victim of illegal surveillance is even entitled to a hearing. These are serious questions of broad impact in an area not yet expounded upon by this Court. In denying the requested interim relief, can the Court possibly hold that the attempt to raise those questions is frivolous? I would grant bail, expedite the grant of certiorari, and put the case down for early argument and decision.